Albert GARZA, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 1085-84.

Court of Criminal Appeals of Texas,
En Banc.

May 17, 1989.

**550**

Richard C. Mosty (court appointed on appeal), Kerrville, for appellant.

Joe Mike Egan, Jr., Former Dist. Atty., E. Bruce Curry, Dist. Atty., Kerrville, Tx. Robert Huttash, State's Atty. & Alfred Walker, First Asst. State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

MILLER, Judge.

Appellant was convicted by a jury for the offense of burglary of a habitation. See V.T.C.A. Penal Code, § 30.02. The jury assessed punishment at 75 years confinement in the Texas Department of Corrections. The case was appealed to the Court of Appeals; the judgment of the trial court was reversed and the case was remanded. *Garza v. State*, 678 S.W.2d 183 (Tex.App.—San Antonio 1984). We granted the State's petition for discretionary review to examine the Court of Appeals' holding.[1] We affirm the decision of the Court of Appeals.

---

1. The State's first ground for review asserts that appellant's rights were not violated by the police when they stopped, detained, and arrested him. Their second ground maintains that the testimony of witness Valdez was not "illegally obtained", *for the reason that it was not uncovered as a result of illegal police activity.* Their third ground for review states that Article 38.23, V.A.C.C.P., does not require the exclusion of witness Valdez's testimony *for the reason that such testimony was not illegally obtained.* In a "supplemental" brief filed by the State's prosecuting attorney, the State complained that the Court of Appeals erred in holding that the doctrine of attenuation, applicable to the exclusionary rule

as promulgated by the U.S. Supreme Court, is not applicable to Texas' statutory exclusionary rule, Article 38.23, V.A.C.C.P. This "supplemental" petition was not granted by this court.

Nevertheless, we pause to disavow the notion that the doctrine of attenuation does not apply to analysis of questions of exclusion of evidence under Art. 38.23. As pointed out by former Presiding Judge Onion in an earlier work, this Court has never held that Article 38.23, supra, absolutely prevents the application of the several exceptions to the application of the exclusionary rule that have evolved over the years. In *Vanderbilt v. State*, 629 S.W.2d 709, 722 (Tex.Cr.

App.1981), *cert. den.,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982), this Court noted that the "[t]hree commonly advanced exceptions to the exclusionary rule include the 'independent source,' 'inevitable discovery,' and 'attenuation' doctrines." With respect to the doctrine of inevitable discovery, the United States Supreme Court adopted and explained the inevitable discovery concept in *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984):

> "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received." See also *United States v. Drosten,* 819 F.2d 1067, 1070 (11th Cir.1987).

This Court has previously applied the principle of inevitable discovery to testimony of witnesses whose discovery was imminent absent illegal state action. See *Vanderbilt, supra,* at 722; *Wicker v. State,* 667 S.W.2d 137, 141–142 (Tex. Cr.App.1984), *cert. den.,* 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984) (Victim's body would have been recovered regardless of the information furnished by defendant's second oral statement); *Dickey v. State,* 716 S.W.2d 499, 505 (Tex.Cr.App.1986) ("Where evidence is obtained after a defendant's constitutional rights have been violated, if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered *by lawful means,* then the deterrence rationale has so little basis that the evidence should be received."); *Bell v. State,* 724 S.W.2d 780, 793 (Tex.Cr.App.1986), cert. denied 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987). (Evidence admissible under the rationale of inevitable discovery). In none of the above cases, or any others we have researched, did Article 38.23, supra, proscribe the admission of previously tainted evidence in light of the recognized exception to the rule. In *Wicker,* supra, at 141, this Court noted that the fruit of the poisonous tree doctrine is *not* applicable "when knowledge or possession of the evidence in question is obtained from a source independent of the state's wrongful act."

> "The standard for determining whether the source of evidence is sufficiently independent of the illegality so as to avoid its taint was set forth in *Wong Sun v. United States,* [371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)]:
>
> We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal action of the police. Rather, the more apt question in such a case is 'whether, granting the establishment of the illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Wicker,* supra, at 141.

No mention was made in *Wicker* that Article 38.23, supra, somehow barred the application of the independent source doctrine.

Similarly, in *Autry v. State,* 626 S.W.2d 758, 764 (Tex.Cr.App.1982), *cert. denied* 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147, we held that "[t]he fruit of the poisonous tree doctrine is not applicable when knowledge or possession of the evidence in question is obtained from a source independent of the government's wrongful act." Autry had signed a written statement following his arrest. After a hearing on Autry's motion to suppress the statement, the trial court ruled that the written statement would not be admissible at trial because the officers had failed to honor Autry's request to remain silent. A subsequent telephone conversation between Autry and his mother was overheard by one of the officers and the admissions made while speaking on the telephone were later admitted at trial over Autry's objection. Autry claimed that "but for the illegal acts of law enforcement officers" he would not have made the admissions which were overheard by the officer. *Autry,* supra, at 764. Writing for the Court, Judge Tom Davis noted:

> "In the instant cause, appellant's telephone call to his mother was shown to be an act of free will. The call was placed after appellant had been allowed to sleep and had not been interrogated for six and one-half hours. The admissions which were made were not the result of interrogation. There was no exploitation of the excluded statement by officers connecting the signing of the statement and the placing of the telephone call. *We find no causal relationship between the admission and the written statement excluded by the court. Those admissions were in no way induced or tainted by the written statement which the court found to have been obtained in violation of appellant's right to remain silent.*"

*Autry,* supra, at 765 (emphasis added).

Again, the *Wong Sun* standard was applied to determine whether the source of evidence was sufficiently independent of the illegality so as to avoid its taint. No absolute bar to the admission of the excluded testimony as a result of Article 38.23, supra, was even alluded to or mentioned in *Autry.* For other cases involving the "independent source" doctrine, see *Eisenhauer v. State,* 754 S.W.2d 159 (Tex.Cr.App. 1988), *cert. denied* —— U.S. ——, 109 S.Ct. 127, 102 L.Ed.2d 101; *Zimmerman v. State,* 750 S.W.2d 194 (Tex.Cr.App.1988); *Brown v. State,* 605 S.W.2d 572, 577 (Tex.Cr.App.1980); *Martinez v. State,* 437 S.W.2d 842, 848 (Tex.Cr.App. 1969) (In-court identification was of an independent origin other than tainted police lineup conducted while accused was without benefit of counsel).

As for the "attenuation doctrine," this Court has frequently applied the standards enunciated in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), where the confession followed the illegal arrest or conduct of the police. Under *Brown v. Illinois,* "[w]hether the taint has been purged must be determined on

We borrow the Court of Appeals' description of the events that led to appellant's arrest:

"Appellant was stopped, questioned and arrested by [Officer] Ragsdale in the City of Boerne, in Kendall County. At the time of the stop, Valadez was a passenger in appellant's car.

Prior to the date of the stop and arrest, there had been several burglaries in a subdivision lying partly in Kendall County and partly in Bexar County. Ragsdale had been told by a Bexar County deputy sheriff that Bexar County officials believed that a person named Albert Garza, Jr., was 'good for' such burglaries. Ragsdale had seen a mug shot of Garza and had received a description, including the license plate number, of Garza's automobile. Ragsdale had been told by a Boerne merchant that he had seen two 'Mexican–American males' parked near the merchant's storage building some days previously, and that the two men had acted in a 'peculiar' manner, which caused the merchant to suspect that they were planning a burglary of the storage building. At the time of the stop and arrest of appellant several days later, no such burglary had occurred. According to Ragsdale, appellant matched the description which the merchant had given of the driver of the car.

Several days later Ragsdale, while on patrol, saw a car leaving Interstate Highway 10 at the Boerne exit. The vehicle matched the description of Garza's car and bore the license number of Garza's car. There were two men in the car and Ragsdale, although he was unable to form a definite opinion, thought that the driver resembled the man pictured on the mug shot of Albert Garza.

Ragsdale followed the vehicle and informed other officers, by radio, that he was about to stop a man he believed to be Albert Garza. Ragsdale turned on the flashing lights of his vehicle, and when appellant came to a stop, Ragsdale parked his vehicle next to the driver's side of appellant's car. By the time Ragsdale left his car and approached appellant, four other officers had arrived to 'back up' Ragsdale. At the time that Ragsdale began to question appellant, one or more of the other officers removed the passenger, Valadez, from appellant's vehicle and engaged him in conversation a short distance away.

In answer to Ragsdale's first question, appellant identified himself as Alberto Garza, Jr. Although this confirmed Ragsdale's belief that appellant was Albert Garza, Ragsdale was not satisfied. When the officer demanded further proof, appellant produced birth and baptismal certificates reflecting that he was Albert Garza. Ragsdale remained dubious because the documents did not bear Garza's picture, bore marks of 'obliteration,' and he 'knew' that such documents were easily falsified. When, at Ragsdale's demand, appellant was unable to produce a driver's license, Ragsdale arrested him for driving without a license. The charge filed against appellant for

the facts of each case after considering such matters as the temporal proximity of the arrest and confession, the presence of intervening circumstances and particularly, the purpose and flagrancy of the official misconduct." *Wicker*, supra, at 141; see also *Self v. State*, 709 S.W.2d 662, 666 (Tex.Cr.App.1986); *Townsley v. State*, 652 S.W.2d 791, 796–797 (Tex.Cr.App.1983); *Coleman v. State*, 643 S.W.2d. 947, 949 (Tex.Cr.App.1982). In *Bell*, supra, at 787–788, we acknowledged that while "[t]he Legislature has determined through its enactment of Arts. 14.02 through 14.04 and 38.23, V.A.C.C.P., that the right to be free from warrantless arrest is at least equal in magnitude to the state and federal constitutional right to be free from unreasonable searches and seizures, ... there is also considerable Texas authority using the *Brown* analysis, and that it appears to be the best available framework for cases involving taint attenuation and determining whether a confession is to be excluded as fruit of an illegal arrest." Even before *Brown v. Illinois* was decided, this court had decided, under the 1925 Code of Criminal Procedure, that "a confession otherwise shown to have been voluntary is not rendered inadmissible by the fact that its author was under arrest or incustody at the tie, even though the arrest may have been under invalid process or without any process or legal right." *Lacefield v. State*, 412 S.W.2d 906, 908 (Tex.Cr.App.1967). Clearly, the Court of Appeals' holding with respect to Article 38.23, supra, is contrary to the well established law of this State.

not having a valid license gave his name as Albert Garza.

Appellant and Valadez were taken to the sheriff's office in separate vehicles. A search of the trunk of appellant's car revealed a number of items taken in recent burglaries. Appellant and Valadez never saw each other again until Valadez testified at appellant's trial.

Valadez told Kendall County officials that six days before the arrest, he had been with appellant when appellant entered a mobile home, while Valadez waited in appellant's car, and the appellant had emerged carrying a television set and some guns. According to Valadez, he and appellant then drove to San Antonio, where appellant stopped at a tire shop and sold the television set and guns to Raymundo Rodriguez, the owner of the tire shop. Valadez later accompanied officers to the Rodriguez tire shop in San Antonio where the officers recovered the guns and television set which were identified by Charles Decherd, the complaining witness in this case, as items which had been taken from his mobile home during the burglary in question.

At appellant's trial, Valadez and Rodriguez testified to facts as related to the officers by Valadez." *Id.* at 185–186. The Court of Appeals concluded, as we ultimately do, that the police activity here was illegal.[2]

---

**2.** It went on to hold that the testimony of the witnesses which resulted from the illegal activity must be excluded under Art. 38.23, V.A.C.C.P., and that this conclusion is unaffected by the Supreme Court's holding in *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). *Garza,* supra at 188–193. As pointed out in footnote one, this further holding was not the subject of that portion of the State's petition that was granted by this court. Thus the correctness of that holding is not before us, and we, as pointed out in footnote one, do not embrace either that holding or its underlying rationale.

We hope that future questions concerning attenuation of the taint of an illegal arrest, vis-a-vis witness testimony obtained as a result of that illegal arrest, will be better developed in the record. In this case, the State never factually or legally argued attenuation in the trial court or in the Court of Appeals. Thus the theory of attenuation, as analyzed in *Ceccolini,*, is not relevant issue in this particular case. To have been a valid issue before this court required that the record contain sufficiently developed facts such that the trial and appellate courts can properly determine whether the State has carried its burden of showing attenuation. In *Ceccolini,* a police officer inadvertently discovered an envelope containing gambling paraphernalia while engaged in a social call at a flower shop. The act of opening and looking into the envelope was, by all accounts, an illegal search. The clerk in the shop, who was a friend of the officer, stated at the scene that the envelope belonged to the defendant, Ceccolini. As a direct result of this discovery, an agent of the Federal Bureau of Investigation interviewed the clerk four months later, and subsequently the clerk's willing testimony (the clerk was a criminal justice student at school and an apparent avid supporter of law enforcement) concerning ownership of the envelope was used to convict the defendant. The trial court found that the clerk's testimony was the direct result of the

illegal search and further found that the government had not sustained its burden of showing that said testimony would have been obtained without the illegal search. The Court of Appeals for the Second Circuit agreed, saying that the road between the search and the witnesses' testimony was uninterrupted. The United States Supreme Court reversed this holding saying that the taint of the illegal search was attenuated under the facts of the case. In doing so, the Supreme Court rejected the government's position that testimony of a live witness should not be excluded per se at trial regardless of its proximity to a Fourth Amendment violation, concluding instead that witness testimony certainly can be the fruit of an unlawful government arrest or search. A cursory analysis of the Court's opinion reveals that exclusion of this testimony depends on the weighing of several factors such as:

the length of the "road" between the illegal activity and the witness' testimony;

the degree of free will exercised by the witness (the greater the willingness of the witness to testify, the greater the *liklihood* that they will be discovered by legal means);

the cost to justice of perpetually excluding the testimony (the greater the cost, the closer and more direct the link between the illegality and the testimony must be);

In finding the taint attenuated, the Supreme Court pointed out that:

1) the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority as a result of [the discovery of the gambling paraphenalia];

2) the paraphenalia itself was not used in the F.B.I. questioning of the clerk;

3) substantial periods of time elapsed between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other;

4) the identity of the clerk and her relationship with the defendant (though not her knowledge about the paraphenalia) was well known to police investigating the defendant, and;
5) the illegal search within the shop was an impulse, there being nothing to suggest that the police officer entered the shop or picked up the envelope with the intent of finding evidence, or that he did so with the intent of finding a willing and knowledgeable witness to testify against the defendant.

The Supreme Court concluded that;

"Application of the exclusionary rule in this situation could not have the slightest deterrent effect on the behavior of an officer such as [the officer who found the envelope]."

*Ceccolini* has subsequently been discussed by the Supreme Court and all circuit courts. The Fifth Circuit has been presented with this issue numerous times and therefore has had ample opportunity to apply the factors and analysis delineated in *Ceccolini*. Cases thus decided can be organized into basically two categories:

I.  *Cases in which testimony of witness is suppressed.*

The first case from the Fifth Circuit to follow *Ceccolini* was *United States v. Cruz*, 581 F.2d 535 (5th Cir.1978) (overruled on other grounds in U.S. v. Causey, 834 F.2d 1179 (5th Cir.1987)). In *Cruz*, the court set out the general principles that evidence obtained as a result of an illegal search is inadmissible unless the connection between the illegal search and the evidence thereafter obtained has become "so attenuated as to dissipate the taint." Out-of-court statements and other verbal evidence derived immediately from unlawful police activity must be excluded unless the evidence was obtained by "means sufficiently distinguishable to be purged of the primary taint." The *Ceccolini* decision applied these principles to the in-court testimony of witnesses located as a result of an illegal search.

The defendant in *Cruz* was convicted of conspiracy to transport illegal aliens and three counts of transporting illegal aliens. The defendant was stopped by a deputy sheriff for making an illegal U-turn, but the court decided this was a pretext stop and that the deputy stopped the vehicle solely to check for illegal aliens. The defendant had a valid driver's license, his front seat passenger had a green card which the deputy suspected was not valid, and three not-so-neatly dressed passengers in the back seat had no identification (the illegal aliens). The deputy arrested everyone. Defendant's conviction was based upon the testimony of illegal aliens found in his car at the time of his stop and arrest. The Fifth Circuit held the testimony was a direct result of the illegal stop and resultant illegal arrest, that to exclude it would serve the purposes of deterring illegal searches in the future and therefore it was inadmissible. The defendant's conviction was reversed for insufficient evidence.

The illegal aliens testified at defendant's trial *two months* after they were arrested. In determining whether their testimony should have been suppressed, the Fifth Circuit applied the *Ceccolini* standards, to wit:

1. Directness: How direct was the relationship between the search and the ultimate testimony?

2. Attenuation: Is the causal relationship weakened by facts showing that the witness's voluntary detached reflection and other circumstances occurring after the search played a significant part in inducing the witness to testify?

3. Inhibitory Effect: Would exclusion of the testimony tend to deter unconstitutional police misconduct?

*Cruz*, supra at 543 (the court restated the *Ceccolini* standards in its own terms). The court held the testimony should have been excluded (suppressed). The court stated at 543:

The witnesses were initially questioned at the very scene of arrest and detained only as a result of the illegal stop. They were detained until the trial and their testimony can hardly be said to be either voluntary or the result of detached reflection. They were discovered as a result of a search having no purpose other than their discovery and apprehension. Finally, the exclusion of their testimony is likely to deter such searches in the future.

Thus, the conviction was reversed.

The D.C. Circuit Court of Appeals, not long after the decision in *Ceccolini*, suppressed the testimony of a witness discovered through materials obtained in an illegal search. In *United States v. Scios*, 590 F.2d 956 (D.C.Cir.1978) (Opinion on Rehearing), the defendant was arrested on February 15, 1974, for tapping telephone lines of a D.C. pharmacy, Your Pharmacy Service. FBI agents had an arrest warrant but no search warrant. While in the defendant's residence, the agents seized a file folder labeled Your Pharmacy Store which contained a credit card receipt in the defendant's name from a motel in D.C. and an itemized bill from the same motel indicating "Mr. Massa" had registered for the room. The date on these items was close in time to the date of the wiretap of Your Pharmacy Store. Using the motel's record of telephone calls made from the room, the agents were able to locate the potential witness, Thomas Massa.

Massa was subpoeaned to appear before a grand jury in D.C. but he was reluctant to talk to the prosecutor. On May 5, 1974, he was told that preparations were being made to grant him immunity. In his first appearance before the grand jury, before immunity had been granted, Massa invoked his 5th Amendment privilege and refused to testify. On May 8, 1974, approximately three months after defendant's arrest, Massa was again taken before the grand jury and refused to testify, but then "reluctantly acquiesced" after being read an order from a district judge which directed him to testify and also granted him immunity. The defendant Scios was thereafter indicted.

Without discussing *Ceccolini*, the circuit court concluded that Massa's giving of testimony was

clearly a product of coercion because his decision to testify was made solely to avoid being jailed for contempt and was not a matter of choice, or free will. *Scios,* supra, at 961. (The court did not discuss *Ceccolini* at this juncture because this portion of the opinion was apparently written on original submission, before *Ceccolini* was decided, and kept on rehearing). The court then, at pp. 962–963, interjected a discussion of *Ceccolini* since it supported the reasoning and result reached by the court in the case at bar, even though the case at bar stood in marked contrast to *Ceccolini* and called for suppression of Massa's testimony. The court noted three critical differences:

1. In *Ceccolini,* the witness's (Hennessey) testimony was an act of free will and was not coerced or induced by official authority. In contrast, Massa initially refused to consult with authorities, and agreed to testify only under threat of contempt and under grant of immunity.

2. Massa's existence as a potential witness was entirely unknown to authorities before they searched Scios's files. The FBI agents did not pursue a investigative trail independent of the illegal search. The court stated that the fact that the investigation took some time, although a material consideration, did not of itself demonstrate that the exclusionary rule is inapplicable. The period of time between the time of the illegal search and the discovery of the witness, or his testimony at trial, is one factor to be considered in determining whether taint has been attenuated.

3. The search of Scios's files was to obtain evidence, the FBI having come to his residence to arrest him for illegal wiretapping. "Excluding the fruit of that illegal search cannot be dismissed as of 'negligible deterrent effect.' "

Thus, the court concluded that taint was not dissipated and that Massa's testimony should have been suppressed.

### II. Cases in which testimony of witness is not suppressed.

In *United States v. Brookins,* 614 F.2d 1037 (5th Cir.1980), the court held witness' testimony was admissible not only because the taint was dissipated, but also under the inevitable discovery doctrine. The facts are somewhat detailed, but suffice it to say police had reason to believe that the defendant had stolen a Jaguar automobile. His car was seen parked outside a motel and authorities confirmed he was staying in the motel. The police apparently began work on securing a search warrant. Meanwhile, another officer procured the motel record of long distance phone calls made by Brookins (the defendant). One phone number was that of an M.D. Holt. Police gave the name to FBI agents who interviewed Holt. The day after Brookins' car was seen at the motel, he was arrested for having an improper license plate. His car was impounded and inventoried, but police had never obtained an arrest or search warrant. During custodial interrogation, Brookins told police he had made a call from the motel to a Carlton Holt. Carlton Holt became the primary witness for the prosecution.

On appeal, Brookins argued that the police learned the existence of Carlton Holt through the illegal interrogation, and that Holt's testimony should have been excluded as the tainted fruit of the poisonous tree. The court disagreed on the basis of *Ceccolini* and found that the taint was attenuated in much the same way as was the connection between the illegal search and the challenged testimony in *Ceccolini.* The court found the following facts compelling:

1. Holt's identity and testimony can be traced to Brookins' motel phone record (unlike the witness in *Ceccolini* who was discovered only through papers from the illegal search).

2. The voluntariness of Holt's testimony, which was indicated by:

   a. testimony was not coerced as in *Ceccolini* even though partially induced by a grant of immunity;

   b. no illegally seized evidence was used in questioning him about the Jaguar theft;

   c. although very little time passed between the interrogation and Holt's arrest, the time factor may be less significant because Holt was not present at the interrogation;

   d. Holt's identity and accomplice activities would have been discovered anyway;

   e. initially police were not guilty of an illegal search, arrest, or interrogation, but attempted illegally to use an interrogation purportedly about. other criminals as a confession.

The court concluded, "balancing the social cost against the deterrent effect of exclusion leads ineluctably to the conclusion that Holt's testimony should be admitted."

In *United States v. Miller,* 666 F.2d 991 (5th Cir.1982), cert. denied 456 U.S. 964, 102 S.Ct. 2043, 102 S.Ct. 2044, 72 L.Ed.2d 489 the court again found testimony admissible for two reasons: attenuated taint and the inevitable discovery doctrine. In *Miller,* the two defendants (husband and wife) were stopped by Texas Department of Public Safety officers at a routine license and vehicle registration checkpoint adjacent to a border patrol checkpoint. Their car was searched, and as a result of the search, police obtained the husband's diary which detailed the defendants' elaborate fraud insurance scheme and mentioned the names of several potential witnesses. Several witnesses for the prosecution were contacted after the police became aware of the scam, and the defendants argued on appeal that the police could not have discovered these witnesses without illegally exploiting the diary.

In applying the *Ceccolini* test to the case, the court held the testimony was sufficiently attenuated from the illegal search of the diary to be admissible. The court actually applied a two-part test from *Ceccolini.* As to voluntariness, the court said it seemed clear that all the witnesses listed in the diary would have come for-

**556**

In its first ground for review, the State argues that there was no stop of appellant's vehicle nor stop or seizure of appellant which resulted in the initial contact with the witness Valadez. This contention is based on the testimony, elicited from Valadez, that appellant stopped his car pursuant to a predetermined plan to go to the Western Auto Parts Store, and not in response to the patrol car's flashing lights.

This Court has held that a "stop" in the law of search and seizure means something other than a "halt." *Ebarb v. State*, 598 S.W.2d 842, 849–850 (Tex.Cr.App.1979) (opinion on state's motion for rehearing). In *Ebarb*, supra, the police followed the defendant's car on the basis of a tip that the defendant was carrying illegal pills and a handgun. When the defendant's car pulled into the driveway of her son's house, the police approached and asked if they could search. Appellant gave her consent to the subsequent search and exited the car. At that time, the dome light in the car illuminated a pistol lying on the seat in plain view. This Court held the fruits of this detention inadmissible, under the authority of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), saying:

"It matters not whether the person was moving or standing still when the police officer accosted him; what matters is that the person was then restrained in his freedom to move. Thus, when a person is sitting in a parked car and a police officer orders him to roll down the window or open the door, there is at that point a temporary seizure for investigative detention—a 'stop.'"

*Ebarb*, supra at 850. See also *Johnson v. State*, 658 S.W.2d 623, 626 (Tex.Cr.App. 1983) (although truck was parked when police first approached, stop "unquestionably" occurred when the defendant was ordered out of his truck and his license demanded); *Beasley v. State*, 674 S.W.2d 762, 766–767 (Tex.Cr.App.1982) (fact that disabled truck was already stopped when police arrived held to have no probative force, citing *Ebarb*, supra).

The State argues that this issue is controlled by *Meredith v. State*, 603 S.W.2d 872 (Tex.Cr.App.1980), *Stewart v. State*, 603 S.W.2d 861 (Tex.Cr.App.1980), and *United States v. Pajari*, 715 F.2d 1378 (8th Cir.1983), all of which concluded that there was no "stop" where previously parked cars were approached by the police. We find each distinguishable on its facts from the case before us. In both *Meredith* and *Stewart*, supra, the police approached cars that were already stopped when first observed, and immediate probable cause in the form of marihuana smoke billowed out of the cars as the window was rolled down (*Stewart*) or the defendant got out of the car (*Meredith*). The detention in both cases occurred at that moment, when the

ward to testify if they had known of the fraud because each witness was a representative of an organization which was either a direct victim or unknowing facilitator of the defendants' fraud. There was also no evidence that any of the witnesses knew of the existence of the diary or that it was used by investigators during questioning.

In applying the second part of *Ceccolini*, the court concluded, after analysis (there was no such analysis done in *Miller*, supra, on this part), the balance between the social cost of exclusion and its potential deterrent effect is struck in favor of allowing the testimony. The second part of the *Ceccolini* "test" seemed to be the easier part to satisfy in proving attenuation of taint.

The Third Circuit has twice upheld the admissbility of testimony after applying the *Ceccolini* standards. See *United States v. Schaefer*, 691 F.2d 639 (3rd Cir.1982), and *United States v. Leonardi*, 447, 623 F.2d 746 (2nd Cir.1980), cert.

denied 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123. In *Schaefer* at p. 644, the court listed the factors to be considered when determining whether taint has been sufficiently attenuated. Those factors are: whether the unlawful intrusion led directly to the testimony in question; the length of time between the unlawful intrusion and discovery of the challenged testimony; whether the witness was himself a suspect; the degree of free will exercised by the witness; and the time, place, and manner of the initial questioning of the witness. The court found that the length of time between the illegal seizure and the discovery of the challenged testimony strongly militated in favor of a finding the that taint had been attenuated (The illegal search and seizure occurred on October 21, 1977, and the principal state's witness did not testify before the grand jury until April 4, 1978, although he had been interviewed by the FBI as early as December 19, 1977. From October 1978 to March 1979, the FBI interviewed other witnesses, and the defendant was indicted finally on December 5, 1979.)

marihuana was discovered. As this Court noted in *Stewart,* supra at 862, "the police exercised no authority until after they had smelled the odor of burning marihuana." Also in *Isam v. State,* 582 S.W.2d 441 (Tex.Cr.App.1979), no stop was found where off-duty police officers witnessed the defendants smoking a marihuana cigarette, pulled up behind the defendants at a red light, approached on foot, and had their suspicions confirmed by the smell of burning marihuana. We noted that the defendants' vehicle "was not stopped by any overt action on the part of the police officers. Only after they stopped at the traffic light was the officer able to approach the vehicle and he noticed the odor of marihuana." *Id.* at 444.

Similarly in *Pajari,* supra at 1381, the court found that no coercive action was taken by the officers until they ordered the defendant out of his car. There the police followed the defendant in his car, parked behind him after he stopped of his own accord in a parking lot, and approached him on foot to inform him of their outstanding warrant to search his house. When they saw the defendant reach under his seat as they approached, they ordered him out with his hands up. Only at this point did the court find that there was any demonstration of force or authority, creating a reasonable apprehension on the defendant's part that his freedom of movement was restricted.

The State also relies upon the similarity of factual circumstances in *United States v. Weir,* 748 F.2d 459 (8th Cir.1984). In *Weir,* an officer, based on information received, followed defendant until the defendant pulled into a convenience store of his own accord. The officer notified his dispatcher that he was "stopping" the vehicle as he pulled in behind it. The defendant got out of his car and walked up to the patrol car, where the officer obtained defendant's consent to search. The court found that there was no detention or interception by the officer because the defendant "initiated the contact by approaching [the] patrol car." *Id.* at 460.

In the case before us, Officer Ragsdale and Valadez both testified that the warning lights began flashing before appellant pulled into the auto parts store. Both witnesses also made it clear that they thought Ragsdale had "stopped" appellant and Valadez. For instance, Valadez testified: "Well, the officer parked, and when we went in the garage he waited, and then when we took off he turned on the light, and then we parked in the auto parts, and that's when he stopped us." Ragsdale testified:

"Q. Did you stop Mr. Garza's vehicle?
A. Yes, sir.
Q. Were there other peace officers there at the time you stopped his vehicle?
A. Yes, sir.
Q. There were other peace officers there?
A. Almost the same identical time that I stopped him, other peace officers had arrived at the location."

(S.F., p. 182)

See also the testimony in footnote 3. As appellant emerged from his car, the lights were flashing, Ragsdale was approaching him on foot and other patrol cars were pulling up. Although the record does not reflect what appellant was thinking during this sequence of events, it cannot be seriously maintained that a reasonable person under the circumstances would have believed that he was free to leave. See *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), *rehearing denied,* 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138, noted in 9 Hofstra Law Review 211 (1980).

It is worth noting in this regard that appellant would have committed a misdemeanor by leaving at that point, as a driver of a motor vehicle who "flees or attempts to elude a pursuing police vehicle, when given visual or auditory signal to bring the vehicle to a stop...." Art. 6701d, § 186(a), TEX.REV.CIV.STAT.ANN. (Vernon's 1977). The situation is closely comparable to that in *State v. Walp,* 65 Or.

App. 781, 672 P.2d 374 (1983), in which the defendant stopped of his own accord and the police car pulled up behind him as the officer turned on the overhead flashing lights. The court cited the comparable Oregon statute in finding that a "stop" occurred, even though the emergency lights were turned on after the defendant came to a voluntary stop. "A reasonable person would not feel free to drive away once the officer turned on the emergency lights. Use of the overhead lights was a sufficient show of authority." *Id.*, 672 P.2d at 375.

Our conclusion is strengthened by the Supreme Court's per curiam opinion in *Colorado v. Bannister*, 449 U.S. 1, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980). The police in that case observed a speeding violation, but were unable to pursue the vehicle before it went out of sight. After hearing a radio dispatch involving a theft of auto parts, they again saw the speeder (still speeding) pull into a service station and stop. They followed him into the station parking lot to issue a citation, leading to a plain view discovery of the stolen auto parts. The Court, presented with this "stop" fact pattern similar to our own, said in Footnote 3: "there can be no question that the stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment." *Id.*, 449 U.S. at 2, n. 3, 101 S.Ct. at 43 n. 3

This statement effectively contradicts the State's misplaced reliance on *I.N.S. v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) and *Florida v. Royer*, supra, for the proposition that interrogation relating to a request for identification does not, by itself, constitute a Fourth Amendment seizure. Although the proposition is advanced by those cases, neither applied it to an automobile stop such as the type that occurred in the case at bar. *I.N.S. v. Delgado*, supra, involved in the use of "factory surveys" of a work force to search for illegal aliens pursuant to warrants issued on a showing of probable cause, and *Florida v. Royer*, supra, involved an airport detention because the defendant fit the "durg-courier profile." We find that there is more to this case than a request for identification, by itself, and

agree with the Supreme Court that "[t]he Fourth and Fourteenth Amendments are implicated in this case because stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.E.2d 660 (1979). We thus conclude that appellant was "stopped" by officer Ragsdale.

The State further argues, in its third ground for review, that Ragsdale was in possession of specific articulable facts that appellant was engaged in criminal activity to justify the detention to determine appellant's identity. It is clear that circumstances short of probable cause may justify temporary detention for purposes of investigation. *Schwartz v. State*, 635 S.W.2d 545, 546 (Tex.Cr.App.1982); *Terry v. Ohio*, supra. To justify an investigative detention, the officer must have specific articulable facts, which, premised upon his experience and personal knowledge, when coupled with the logical inferences from those facts would warrant the intrusion on the detainee. These facts must amount to more than a mere hunch or suspicion. *Williams v. State*, 621 S.W.2d 609, 612 (Tex.Cr.App. 1981). The articulable facts used by the officer must create some reasonable suspicion that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication the unusual activity is related to crime. *Meeks v. State*, 653 S.W.2d 6, 12 (Tex.Cr.App.1983); *Schwartz*, supra at 547, citing *Shaffer v. State*, 562 S.W.2d 853 (Tex.Cr.App.1978).

■ Prior to the time he stopped appellant, Ragsdale had observed nothing to indicate that an offense was being committed or had been committed and nothing to suggest that any illegal activity was about to take place. The information that Ragsdale received through police channels was that a person named Albert Garza, Jr., was "good for" burglaries such as those that had occurred recently in Kendall County. Ragsdale had seen a mug shot of Garza and had

received a description, including the license plate number, of Garza's automobile. Ragsdale had also heard that Garza was a narcotics addict. "The total information, then, was merely that appellant, a dope addict according to a computer print-out, had been seen at some unspecified times in an area where some unspecified burglaries had been committed at some unspecified times." *Garza,* supra at 188. The evidence relating to appellant's alleged behavior toward the Boerne merchant is similarly inconclusive, particularly because no burglary of that building is in evidence.

The State argues that we should follow the decision of the Waco Court of Appeals in *Griffin v. State,* 683 S.W.2d 16 (Tex. App.—Waco 1984), no petition. The police officer, there, pulled the defendant over because he looked like a composite drawing of an aggravated burglary suspect and his car substantially matched that of the burglary suspect. The defendant was subsequently arrested when the officer observed a revolver on the floorboard. These facts are distinguishable from the case before us, because appellant here was never linked to any particular crime by the information Ragsdale possessed.

The case we find that most closely resembles this one is *Armstrong v. State,* 550 S.W.2d 25 (Tex.Cr.App.1976) (opinion on state's motion for rehearing, 1977). There the officer had received some information concerning burglary suspects and a certain vehicle. He saw a car one day which matched the description he had, and the next day saw the same vehicle, which then appeared to have been painted over with spray paint. He made a stop, without having observed any violations or anything suspicious. The detention was held to be "just the sort of fishing expedition the Fourth Amendment and Article I, § 9 of the State Constitution, were designed to prohibit." *Id.* at 31; see also *Leighton v. State,* 544 S.W.2d 394 (Tex.Cr.App.1976) (opinion on appellant's motion for rehearing, 1976) (defendant seen driving a white Fiat that the officers believed was parked

in front of a house that was allegedly burglarized). We conclude that this detention was not supported by sufficient articulable facts.

■ The State's fourth ground for review asserts that there is no evidence that Ragsdale's request for a driver's license from appellant was a subterfuge to validate an otherwise unlawful detention. Ragsdale ostensibly requested the license as a means of identification because the baptismal and birth documents which appellant produced bore no photograph and their authenticity was suspect. We note that this would be a more tenable position if the documents provided by appellant did not confirm that he was exactly who Ragsdale thought he was, and who he had already said he was. Ragsdale's further pursuit of identification tends to indicate a desire to find some justification for the stop.

In *Delaware v. Prouse,* supra, the Supreme Court invalidated random, discretionary stops to examine drivers' licenses. The State contends, and we agree as the Court of Appeals did, that *Delaware v. Prouse,* supra, is inapplicable here. Clearly, Ragsdale did not stop appellant for purposes of determining if he had a driver's license. Appellant was stopped because Ragsdale thought he was Albert Garza and wanted to find out.[3]

A driver's license check may not be used as a subterfuge to cover up an unlawful stop based on mere suspicion. *McMillan v. State,* 609 S.W.2d 784, 787 (Tex.Cr.App. 1980); *White v. State,* 574 S.W.2d 546 (Tex. Cr.App.1978). The State directs us to *Razo v. State,* 577 S.W.2d 709 (Tex.Cr.App.1979), but *Razo* involved the development of probable cause—again, the smell of marihuana—in the course of a non-random, systematic license check. We repeated there that "the mere asking for a driver's license will not validate the stopping of an automobile if it is clear the license check was not the reason for the initial detention." *Id.* at

---

**3.** Ragsdale testified: "Well, the reason I stopped him is I wanted to make absolutely positive that the man that was driving that vehicle was Albert

Garza, Jr. And I asked him for his identification. I asked him if he was Albert Garza, Jr., and he said, 'Yes.'" (Statement of Facts, p. 191)

711, citing *Fatemi v. State,* 558 S.W.2d 463, 465 (Tex.Cr.App.1977). Under this standard, we conclude that the license check here was a subterfuge, because there is no question that the initial stop was not for a license check.

The State's fifth ground for review asserts that "[t]he court of appeals correctly found that when 'Appellant was unable to produce a driver's license, Ragsdale arrested him for driving without a license.' [*Garza,* supra at 186]. *There was no detention or arrest of Appellant for failing or refusing to identify himself as in Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)." State's Petition for Discretionary Review, p. 5. (Emphasis in original.) We have no disagreement with this rather unusual ground for (non) review, but it is beside the point. Appellant was arrested for driving without a license, and not for failing to identify himself, but we have already held that the stop itself was illegal so that the resulting arrest was also illegal.

■ The State's second ground for review is even more novel and untenable. It asserts that the discovery of the witness Valadez in appellant's vehicle was not the result of any detention or arrest of appellant, because Valadez was in open view to Ragsdale as appellant drove along the public street. This attempted application of "plain view" doctrine to the discovery of a witness would certainly turn the Fourth Amendment, in part at least, on its head.

The State attempts to rely upon typical plain view cases, where either illegal activity occurs in a situation that evidences no reasonable expectation of privacy [e.g., *Jordan v. State,* 576 S.W.2d 825 (Tex.Cr. App.1978)], or incriminating objects or fruits of crime are discovered in plain view [e.g., *Ellingsworth v. State,* 487 S.W.2d 108 (Tex.Cr.App.1972)]. These situations involve discovery of evidence that is immediately perceptible as subject to seizure. *Snider v. State,* 681 S.W.2d 60 (Tex.Cr. App.1984). There was nothing to indicate that the person of Valadez was similarly

incriminating to the appellant, or that Valadez' testimony was somehow in plain view.

In any case, application of the plain view doctrine requires that the police have a right to be where they are when the evidence is perceived. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Snider,* supra at 63. Because the stop here was illegal, that requirement is not satisfied, and as we stated, there was nothing incriminating about Valadez when seen in the car before the stop that would allow the invocation of plain view doctrine at that point. If we followed the State's reasoning here, no potential witness would be safe from warrantless seizure without probable cause, the minute he showed his face outside.

The grounds for review upon which the State's petition for discretionary review were granted[4] having been resolved against the State, the judgment of the Court of Appeals is affirmed.

CLINTON J., while joining the judgment, would not address matters discussed in notes 1 and 2 because in its third ground for review the State concedes that the holding of the Court of Appeals is "a correct statement of law."

WHITE and BERCHELMANN, JJ. concur in the result.

McCORMICK, P.J., and DAVIS, J., dissent.

---

**4.** See footnotes one and two.