**Opinion filed August 15, 2013**



In The

# Eleventh Court of Appeals

_____

## Nos. 11-12-00251-CR & 11-12-00252-CR

_____

## CATHY LYNN BOYD, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 39th District Court

Haskell County, Texas

Trial Court Cause Nos. 6496 & 6540

### O P I N I O N

The jury convicted Cathy Lynn Boyd, in trial court cause number 6496,[1] of unlawful use of a criminal instrument. The jury assessed her punishment at confinement for two years in a state jail facility and imposed a fine of $2,000. The

---

[1]Cause No. 6496 is on appeal in this court as Cause No. 11-12-00251-CR.

same jury convicted Appellant, in trial court cause number 6540,[2] of the offense of possession of anhydrous ammonia with the intent to manufacture a controlled substance. For that conviction, the jury assessed Appellant's punishment at confinement for twenty-five years and imposed a fine of $2,500. The trial court sentenced Appellant accordingly. We affirm.

## I. *Issues Presented*

In her first issue in each case, Appellant complains that the trial court abused its discretion when it denied her motion to suppress the fruits of an unlawful detention. In her second issue in each case, Appellant challenges the sufficiency of the evidence.

## II. *The Charged Offenses*

The State first charged Appellant with unlawful use of a criminal instrument. A person commits the offense of unlawful use of a criminal instrument if she possesses a criminal instrument with the intent to use it to commit an offense or—with knowledge of its character and with the intent to use it, or to aid or permit another to use it, in the commission of an offense—she manufactures, adapts, sells, installs, or sets up a criminal instrument. *See* TEX. PENAL CODE ANN. § 16.01 (West Supp. 2012).[3] A criminal instrument is defined as any object that is legal to possess, manufacture, or sell but "that is specially designed, made, or adapted for use in the commission of an offense." *Id.* § 16.01(b)(1).

The State also charged Appellant with possession or transport of certain chemicals with the intent to manufacture a controlled substance. A person commits the offense of possession or transport of certain chemicals with the intent

---

[2]Cause No. 6540 is on appeal in this court as Cause No. 11-12-00252-CR.

[3]Appellant committed the offense on May 23, 2011. Section 16.01 of the Texas Penal Code was amended effective September 1, 2011, but we use and refer to the statute in force at the time of the offense.

to manufacture a controlled substance if, with the intent to unlawfully manufacture a controlled substance, she possesses or transports anhydrous ammonia. TEX. HEALTH & SAFETY CODE ANN. § 481.124(a)(1) (West 2010). Intent to unlawfully manufacture the controlled substance methamphetamine is presumed if the actor possesses or transports anhydrous ammonia in a container or receptacle that is not designed and manufactured to lawfully hold or transport anhydrous ammonia. *Id.* § 481.124(b)(1).

### III. *The Trial Evidence*

The old Farmer's Gin in Rochester is located between Second and Third Streets. There was an anhydrous ammonia tank located on the property. The tank was used to fill smaller tanks and was known as a "nurse tank." Farmers use anhydrous ammonia for agricultural uses, but it can also be used to manufacture methamphetamine. Deputy Sheriff Greg Hearn and Haskell County Sheriff David Halliburton suspected that someone had been stealing anhydrous ammonia from the nurse tank. Deputy Hearn had seen the nurse tank and had seen various hoses attached to it.

Deputy Hearn is a 52-year resident of Rochester. He had served as its police chief for nineteen years. At the time of this offense, Deputy Hearn was a deputy with the Haskell County Sheriff's Department. Deputy Hearn was the only law enforcement officer who lived in Rochester. He lived in close proximity to the old Farmer's Gin. At some time around 4:00 a.m. on the date of this offense, Deputy Hearn heard a loud noise that he thought came from the muffler of a vehicle close to the gin. He also heard his dogs barking. However, when he went outside, he saw nothing. Within five minutes, he was dressed and drove his patrol car to the gin.

As Deputy Hearn drove up to the gin, he saw an S-10 Chevrolet pickup that was parked with its lights off in a dark area behind a mini-storage facility about

one block from the gin. There were two people in the pickup, and the pickup was parked so that the occupants had a clear view of the nurse tank. When Deputy Hearn made a U-turn toward the pickup, its driver "cut their lights on" and drove away. Because he suspected criminal activity, Deputy Hearn followed and ultimately stopped the pickup.

As Deputy Hearn came up to the pickup, he noticed several items in plain view in the bed of the pickup. He saw a yellow air compressor that had been modified from its original use—the motor was missing and the brass valve connections had "backwards" threads that were slightly discolored or "green." Deputy Hearn also saw a black, high-pressure filler hose that had been spliced. He further noted a small ice chest in the pickup bed that contained tools and various fittings, and he saw a pipe wrench inside the cab of the pickup.

Laura Benson drove the pickup, and Appellant was the passenger. Deputy Hearn asked them where they were going. They told Deputy Hearn that they were looking for a friend; they could not remember the friend's name. After Sheriff Halliburton arrived, he separated Benson and Appellant and read them their rights. Each of them told different stories to him. Each claimed that the other put the yellow tank in the pickup, but both denied that the tank belonged to either one of them.

Meanwhile, Deputy Hearn returned to the gin and found a 20 or 25 gallon butane tank that was connected to the nurse tank. Sheriff Halliburton joined him and found that frost had formed halfway up the butane tank and that there was a white vapor coming from it; anhydrous ammonia was being transferred from the nurse tank into the butane tank. There was also a strong odor in the air. Sheriff Halliburton and Deputy Hearn arrested Appellant and Benson and seized the yellow tank, the butane tank, Teflon tape, and the ice chest and the tools in it as well as fittings and other items.

4

IV. *Reasonable Suspicion*

We review a trial court's denial of a motion to suppress under a bifurcated standard of review. *Pecina v. State*, 361 S.W.3d 68, 79 (Tex. Crim. App.), *cert. denied*, 133 S.Ct. 256 (2012); *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011); *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). We defer to the trial court's findings of historical fact supported by the record and review de novo the trial court's application of the law. *Leza*, 351 S.W.3d at 349; *Herrera v. State*, 241 S.W.3d 520, 526–27 (Tex. Crim. App. 2007); *Davila v. State*, 4 S.W.3d 844, 847–48 (Tex. App.—Eastland 1999, no pet.). We review the evidence in the light most favorable to the trial court's ruling and will uphold the ruling if it is reasonably supported by the record. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

Appellant argues in her first issue in each appeal that the trial court erred when it denied her motion to suppress because Deputy Hearn lacked reasonable suspicion for the traffic stop. Police officers may stop and briefly detain a person suspected of criminal activity with less justification than is constitutionally required for an arrest. *Terry v. Ohio*, 392 U.S. 1, 22–26 (1968); *Garza v. State*, 771 S.W.2d 549, 558 (Tex. Crim. App. 1989). An officer must suspect that "some activity out of the ordinary is occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication the unusual activity is related to crime" in order to temporarily detain a suspect. *Garza*, 771 S.W.2d at 558; *see also Terry*, 392 U.S. at 21–22.

The detaining officer must have a particularized and objective basis for suspecting the particular person of criminal activity. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). "[S]ome quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure." *United States v. Martinez-*

5

*Fuerte*, 428 U.S. 543, 560 (1976). Innocuous conduct alone does not justify an investigatory stop requiring reasonable suspicion unless the officer knows of other information or surrounding circumstances. *United States v. Sigmond-Ballesteros*, 247 F.3d 943, 949 (9th Cir. 2001); *Klare v. State*, 76 S.W.3d 68, 73 (Tex. App.— Houston [14th Dist.] 2002, pet. ref'd). An officer must point to facts that would lead a reasonable person to believe that the accused was engaged in a criminal act. *Viveros v. State*, 828 S.W.2d 2, 4 (Tex. Crim. App. 1992). It is "an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21–22.

We consider the totality of the circumstances when reviewing the record for reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 8 (1989); *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). When viewed under the totality of the circumstances and in light of the officer's experience, the facts pointed to by the officer and the inferences rationally drawn from those facts must support a reasonable suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 27; *Woods*, 956 S.W.2d at 38. We avoid a formulaic approach or piecemeal comparison and, instead, consider the totality of the circumstances and reasonable inferences from the facts to determine whether Deputy Hearn had reasonable suspicion. *See Tanner v. State*, 228 S.W.3d 852, 854 (Tex. App.—Austin 2007, no pet.).

An officer who does not have enough information to make an arrest is not required to "simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (1972). In *Tanner v. State*, an officer observed a male and female pushing bicycles from an alley behind a bar at 3:00 a.m., and the officer knew that the bar had closed long before that. 228 S.W.3d at 854. As the officer approached the two people, he flashed his overhead lights. *Id.* The woman stopped, but the man continued walking. *Id.* The officer

6

drove to the place where the man had walked, conducted a pat-down for weapons, and then asked the man for consent to a search; he consented. *Id.* at 854–55.

The *Tanner* court concluded the stop was reasonable at its inception based on the time of night and the location and reasoned that, if the bar had been vandalized or robbed, "it is unlikely [the owner] would have been reassured to learn that [the officer] did not stop the two people he saw walking from behind the closed bar at 3:00 a.m." *Id.* at 859 (citing *Terry*, 392 U.S. at 23 (describing facts of the stop and stating that "[i]t would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further")).

Appellant cites *Gamble v. State* and *Klare v. State* to support her position that Deputy Hearn lacked reasonable suspicion to stop her. In *Gamble*, the appellant was walking toward a residence in an area rife with complaints of drug sales, and when a police car approached the area, he watched the police car pass and then walked away from the residence when the patrol car turned around. 8 S.W.3d 452, 453 (Tex. App.—Houston [1st Dist.] 1999, no pet.). The *Gamble* court concluded that, under the totality of the circumstances, "the area's high-crime reputation" and "appellant's watching the passing police car" did not justify a detention. *Id.* at 454. In *Klare*, an officer saw a car parked behind a shopping center at 2:30 a.m. facing a twenty-four hour convenience store, so the officer exited the highway and circled back to the parking lot, but the car had left. *Klare*, 76 S.W.3d at 71. The officer spotted a similar vehicle driving on an adjacent road and conducted a traffic stop. The *Klare* court concluded that the officer lacked reasonable suspicion because there was no evidence this was a high-crime area with recent reports and because the officer never testified he believed a crime had been committed. *Id.* at 71, 77.

7

In this case, Deputy Hearn observed conduct that was very unusual, given his fifty-two years of living in Rochester and over two-decade career as a peace officer. Deputy Hearn and Sheriff Halliburton suspected past thefts of anhydrous ammonia from the nurse tank. Deputy Hearn testified that a pickup parked in a business district with its lights off at 4:00 a.m., but with occupants sitting in the pickup in the dark, was very unusual. He observed that the occupants had a direct line of sight to the nurse tank from which, at that very moment, anhydrous ammonia was being transferred into the butane tank. Deputy Hearn testified that there was some security lighting near the nurse tank but not close to the pickup and that, as he approached the pickup, the driver of the pickup turned the headlights on and drove away. He then immediately followed and stopped the pickup because he suspected there was criminal activity afoot.

We have outlined the information known to Deputy Hearn at the time of the traffic stop in this case. Deputy Hearn heard sounds in the early morning hours and investigated the location of recent prior criminal activity. He had been previously investigating tampering with the anhydrous ammonia nurse tank at the gin and recent anhydrous ammonia thefts from it. He found Appellant at 4:00 a.m. in a darkened and parked pickup, with its headlights off, behind a mini-storage facility, but directly facing the nurse tank in such a way to directly observe the tank. When Deputy Hearn approached the pickup, the driver turned the headlights on the pickup, and she and Appellant drove away. When we consider the totality of the circumstances present, we cannot conclude that the trial court erred when it found Deputy Hearn had reasonable suspicion to stop the pickup in which Appellant was riding. Appellant's first issue on appeal in each case is overruled.

## V. *Sufficiency of the Evidence*

Appellant challenges the sufficiency of the evidence in both cases because (1) she was merely a passenger in the pickup and did not exclusively possess the

8

alleged contraband: namely, the yellow tank, the butane tank, and the anhydrous ammonia in the butane tank and (2) she did not illegally possess anhydrous ammonia. We apply the sufficiency standard outlined in *Jackson* and its progeny for Appellant's sufficiency challenge. *Jackson v. Virginia*, 443 U.S. 307, 318, (1979); *Brooks v. State*, 323 S.W.3d 893, 894 (Tex. Crim. App. 2010); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We review all of the evidence admitted by both the State and Appellant in the light most favorable to the jury's verdict and decide whether any rational jury could have found each element of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.

Appellant contends that "affirmative links" must link the contraband to her when the contraband is in a place that is not within her exclusive possession. *See Deshong v. State*, 625 S.W.2d 327, 329 (Tex. Crim. App. 1981) ("When the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband.").

The State had to prove that Appellant had knowledge of the character of the yellow tank and that she altered the yellow tank with the intent to use it to commit the offense of possession with the intent to manufacture a controlled substance. Deputy Hearn testified that he saw the pickup that Appellant occupied near the nurse tank. It appeared that Appellant and Benson were watching the butane tank and the nurse tank, but they left when Deputy Hearn started toward them. Deputy Hearn immediately followed them and made a traffic stop. We have described the items that he found in the pickup, and we have set out the content of Appellant's and Benson's statements. Sheriff Halliburton testified that Appellant and Benson each claimed that the other had put the yellow tank in the pickup and that both denied owning it.

9

Deputy Hearn and Sheriff Halliburton testified that they discovered a butane tank connected to the nurse tank. They testified that the butane tank had frost on it and was leaking white vapor and that there was a strong ammonia odor near the butane tank. The owner of the nurse tank testified that the nurse tank contained anhydrous ammonia. Both officers testified that they observed anhydrous ammonia being transferred from the nurse tank to the butane tank. Sherriff Halliburton used gloves to turn off the valve to the butane tank to stop the flow of anhydrous ammonia from the nurse tank into the butane tank. Because he did not have a proper container for the anhydrous ammonia, he turned over the butane tank and disposed of the anhydrous ammonia on the ground.

Both Deputy Hearn and Sheriff Halliburton also testified that Appellant and Benson could not recall the name of the friend they were to meet at 4:00 a.m. in Rochester. The officers recalled that Appellant and Benson gave conflicting statements at the scene. The officers further reported that both women said the other had put the yellow tank in the pickup and that the women claimed not to know anything about the tank. Finally, Sheriff Halliburton observed that the tire tread on the pickup was similar to tire tracks he photographed near the nurse tank and the butane tank. Although Appellant's counsel called these facts into question, the jury could believe or disbelieve the peace officers' testimony.

We hold that a rational jury could have believed that Appellant was in the parked pickup watching the butane tank fill with anhydrous ammonia. We also hold that a rational jury could have believed that Appellant possessed the butane tank that contained anhydrous ammonia. We further hold that a rational jury could have believed that Appellant altered the yellow tank with the intent to use it to steal anhydrous ammonia from the nurse tank. We overrule Appellant's sufficiency-of-the-evidence issues in each appeal.

10

## VI. *This Court's Ruling*

We affirm the judgments of the trial court.


MIKE WILLSON

JUSTICE


August 15, 2013

Publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.

11