**Ryan Jeffery TANNER, Appellant**

v.

**The STATE of Texas, Appellee.**

No. 03-06-00217-CR.

Court of Appeals of Texas, Austin.

June 20, 2007.

Edward K. Downing Jr., Austin, for Appellant.

M. Scott Taliaferro, Asst. District Atty., Austin, for State.

Before Chief Justice LAW, Justices PURYEAR and HENSON.

## *OPINION*

DAVID PURYEAR, Justice.

After the trial court conducted a hearing and overruled his motion to suppress, appellant Ryan Jeffery Tanner pled guilty to the second-degree felony offense of possessing with intent to deliver more than one but fewer than four grams of methamphetamine. *See* Tex. Health & Safety Code Ann. § 481.102(6) (West Supp.2006), § 481.112(a), (c) (West 2003). The trial court assessed punishment at five years in prison and a $500 fine, but pursuant to a plea agreement, suspended this sentence and placed Tanner on community supervision for five years. On appeal, Tanner contends that the trial court erred in denying his motion to suppress evidence, arguing that the arresting officer lacked reasonable suspicion to stop him. We affirm the trial court's judgment.

### Factual Summary

The only evidence produced at the hearing was the testimony of the arresting officer, Henry Maldonado of the Travis County Sheriff's Office. Maldonado testified that at about 3:00 a.m. on January 21, 2005, he was conducting a routine patrol in a "pretty excluded [sic] area" with very little ambient light coming from a gas station about one-quarter of a mile away, when he saw Tanner and a young woman pushing bicycles out from a dark area behind the Lone Star Bar. Maldonado did not see them commit any traffic violations. Although Maldonado stated in an affidavit executed immediately after the arrest that he contacted Tanner and the woman because he thought they "might need assistance due to the cold weather and time of day," he testified at the suppression hearing that he was suspicious because they were coming from behind the Lone Star Bar at 3:00 a.m., which he knew typically closed by 2:00 a.m. Maldonado admitted that he was not familiar with the bar's employees and did not know how long it took to clean the bar after closing, nor did he testify that the area had a history of burglaries, vandalism, or drug trafficking. The record does not reflect that any criminal activity had occurred in or near the bar that particular evening.

Maldonado flashed his patrol car's lights to signal for Tanner and his companion to stop. The woman, who was walking behind Tanner, stopped, but Tanner continued walking without changing his pace or direction, even after Maldonado called out to him.[1] Maldonado drove about 50 yards to Tanner, who then stopped. Maldonado observed two large knives clipped to the inside of Tanner's pants pockets. Maldonado inspected the knives and determined that they were legal and then patted Tanner down for additional weapons, finding one small knife. According to his affidavit, Maldonado asked Tanner if he had any other contraband, particularly drugs, and Tanner replied, "I don't know; you can check." Maldonado asked for permission to search Tanner's pockets, and Tanner

---

1. The record does not indicate when Tanner first saw the lights or heard Maldonado.

replied, "Go ahead and take the stuff out." During his search, Maldonado found a closed pocketknife sheath in Tanner's left front pants pocket that had clear plastic sticking out from the inside. Maldonado opened the sheath and saw a small clear plastic bag that held ten smaller bags of methamphetamine. Maldonado testified that each bag appeared to contain the same quantity, as if the drugs were separated for delivery.

The trial court, calling the decision "a close call," denied Tanner's motion to suppress.[2] Pursuant to the plea agreement, the court suspended the five-year sentence and imposed community supervision for five years. The trial court certified Tanner's right to appeal matters that were raised by written motion and ruled on before trial.

## Standard of Review

 Citizens have the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. However, if an officer has reasonable suspicion to believe that an individual is involved in criminal activity, the officer may conduct a brief investigative detention. *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex.Crim.App. 2000). The reasonableness of a temporary detention must be considered in view of the totality of the circumstances at the inception of the encounter, and the officer must be able to point to specific, articulable facts that, combined with rational inferences from those facts, would lead him to reasonably suspect that a specific person had engaged in or was or soon would be engaging in criminal activity. *Garcia v. State*, 43 S.W.3d 527, 530 (Tex.Crim.App.

2001). Reasonable suspicion must be based on more than a non-specific suspicion or mere "hunch" of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The State has the burden to show that the officer had an objective basis for the stop, and the officer's subjective intent is irrelevant to the determination of reasonable suspicion. *Garcia*, 43 S.W.3d at 530. We look only at the facts known to the officer at the inception of the stop; an initially unlawful stop is not validated by the discovery of criminal activity. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

 The constitutional prohibition on unreasonable searches and seizures, a "relatively simple concept[ ]," *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), guards against "arbitrary invasions solely at the unfettered discretion" of law enforcement officers. *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). We require only a "minimal level of objective justification" on the part of the officer, Sokolow, 490 U.S. at 7, 109 S.Ct. 1581 (quoting *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)), and our "determination of reasonable suspicion must be based upon commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). "[T]here is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" *Terry*, 392 U.S. at 21, 88 S.Ct.

**2.** The trial court did not make findings of fact, but stated, "I don't think there's anything inherently wrong or suspicious in walking a bike but will concede, I've walked my bike in the vicinity of lots of law enforcement officers over the decades and haven't ever been stopped. But then again, I've never walked my bike at 3:00 in the morning out from behind a darkened, closed business establishment. And I think that is ... articulable suspicion for the encounter."

1868 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 534–37, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)).

 When reviewing a trial court's decision on a motion to suppress, we give almost total deference to the court's determination of historical facts but review de novo its application of the law to the facts. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim.App.2002). When the trial court does not make explicit findings of historical facts, we view the evidence in the light most favorable to the court's ruling and assume the court made implicit findings of fact supported by the record. *Carmouche*, 10 S.W.3d at 327–28. The trial court is the sole judge of the credibility of the witnesses and their testimony. *Maxwell*, 73 S.W.3d at 281.

## Discussion

 There is no question that an investigative detention occurred when Tanner stopped walking in response to Maldonado's demand.[3] Thus, the State was required to prove that Maldonado had reasonable suspicion for the detention at the time the stop began. Tanner contends that the trial court's denial of his motion to suppress violated his constitutional rights and that the police lacked reasonable suspicion for the stop.[4] To show reasonable suspicion, the State points to Maldonado's testimony that he stopped Tanner and his companion because they were walking at 3:00 a.m. from a dark area behind the bar, a business that "had been well closed by that time." He also testified that his suspicions increased when Tanner's companion stopped soon after he flashed his patrol car's lights, but Tanner continued walking until Maldonado drove up to him.

The reasonableness of a search "is determined 'by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.'" *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 187–88, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)); *see also Terry*, 392 U.S. at 20–21, 88 S.Ct. 1868 (in assessing reasonableness, courts should focus on governmental interest that arguably justifies intrusion on constitutional rights). An officer may not act solely on a hunch, but his determination of "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *see Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581 (reasonable suspicion requires "minimal level of objective justification").

In conducting our review, we must heed the Supreme Court's admonitions that "the concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules,'" *Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581

---

3. When an officer flashes his lights, that showing of authority triggers constitutional safeguards because a reasonable person would not feel free to leave. *Garza v. State*, 771 S.W.2d 549, 558 (Tex.Crim.App.1989); *Hernandez v. State*, 963 S.W.2d 921, 924 (Tex. App.-San Antonio 1998, pet. ref'd). An investigative detention occurs once the individual yields to the officer's authority. *Johnson v. State*, 912 S.W.2d 227, 234 (Tex.Crim.App. 1995).

4. Tanner also asserts that the stop violated his rights under the Texas Constitution and Texas Code of Criminal Procedure. However, he does not make separate arguments for these claims and the Texas cases he cites do not address state constitutional claims or interpret the state constitution as requiring more than the federal constitution. *See Gearing v. State*, 685 S.W.2d 326, 329 (Tex.Crim.App. 1985). Thus, we decline to address his state claims separately. *See Emery v. State*, 881 S.W.2d 702, 707 n. 8 (Tex.Crim.App.1994).

(quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)), and that assigning a precise definition to reasonable suspicion "is not possible." *Ornelas v. United States*, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Our inquiry into reasonable suspicion is "multi-faceted," and determinations made in other cases " 'will seldom be a useful "precedent" for another.' " *Id.* at 698, 116 S.Ct. 1657 (quoting *Gates*, 462 U.S. at 238 n. 11, 103 S.Ct. 2317). Instead, reasonable suspicion is a "commonsense, nontechnical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Id.* (quoting *Gates*, 462 U.S. at 231, 103 S.Ct. 2317 (quoting *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949))). The facts are judged under "an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868. Thus, we should avoid a formulaic approach or a piecemeal comparison of similar factors in other cases, and instead consider the totality of the circumstances in *this case* and rely on commonsense inferences, asking whether it was reasonable for Maldonado to be suspicious upon seeing someone walk from behind a darkened, closed business at 3:00 a.m., in a quiet area with minimal light. In other words, we must look at the totality of the circumstances of this particular case and ask whether Maldonado was justified in drawing "inferences from and deductions about the cumulative information" available to him at the time of the stop. *See Arvizu*, 534 U.S. at 273, 122 S.Ct. 744.

When we review the trial court's determination of the historical facts for clear error only, deferring to inferences drawn from those facts by Maldonado and the trial court, *see Ornelas*, 517 U.S. at 699–700, 116 S.Ct. 1657, and view the evidence in the light most favorable to the court's decision, assuming that the court made "implicit findings of fact supported in the record," *see Balentine v. State*, 71 S.W.3d 763, 768 (Tex.2002) (citing *Carmouche*, 10 S.W.3d at 327–28), we cannot hold that the trial court erred in its application of the law to the facts. We must give due weight to the trial court's determinations that Maldanado was credible and that his inferences were reasonable. *See Ornelas*, 517 U.S. at 699, 116 S.Ct. 1657; *Balentine*, 71 S.W.3d at 768. We may not re-weigh Maldonado's credibility. *See Garcia*, 43 S.W.3d at 530 (appellate courts should give "almost total deference to a trial court's ... application of law to fact questions that turn on credibility and demeanor").

The governmental interest here is the prevention and detection of theft and other crime. Maldonado testified to the articulable factors of time, place and circumstances, and a person "of reasonable caution" could conclude that it was appropriate to briefly detain Tanner to investigate the possibility of a burglary or other criminal activity. We must rely on "commonsense judgments and inferences about human behavior," *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673, and remember that we are dealing with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gates*, 462 U.S. at 232, 103 S.Ct. 2317 (quoting *Brinegar*, 338 U.S. at 175, 69 S.Ct. 1302). When we consider the entire circumstances and attendant reasonable inferences, the facts could reasonably give rise to an inference that criminal activity might be afoot. *See Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581.

We recognize that one of our sister courts has held that an investigative detention must be based on more than just

a person's suspicious location or the time of day because those factors focus on the suspect's surroundings rather than the suspect himself. *See Klare v. State*, 76 S.W.3d 68, 75 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd).[5] However, we believe the *Klare* majority made two important errors in its analysis. First, the majority compared the individual facts testified to by the arresting officer to the treatment of similar facts in other cases, an approach discouraged by the Supreme Court in *Ornelas*, 517 U.S. at 698, 116 S.Ct. 1657. *Klare*, 76 S.W.3d at 74–76. More importantly, the *Klare* majority focused on the circumstances of the stop piecemeal, viewing each fact independently from the others, an approach rejected in *Arvizu*, 534 U.S. at 274, 122 S.Ct. 744, and holding that neither the time of day nor the location where the vehicle initially caught the officer's eye by itself justified the stop. *Klare*, 76 S.W.3d at 73–75. If Maldonado had testified only to the

lateness of the hour or to the fact that Tanner was seen walking out from behind a closed, darkened building in dimly lit area, this would have been a more difficult case. However, when the time of night and location are viewed together and common sense is applied to the totality of these circumstances, we cannot conclude that the trial court erred in finding that the stop was supported by reasonable suspicion.

## Conclusion

Officer Maldonado made an on-the-spot observation of conduct that, by any standard, is unusual and highly consistent with criminal behavior. He observed two individuals coming out from behind a darkened place of business at 3:00 a.m. He knew the bar "had been well closed by that time." Maldonado testified that there was little ambient light in the area, rendering most of the surrounding area dark. An officer who does not have enough informa-

---

5. The *Klare v. State* majority considered and discarded one by one the factors articulated by the arresting officer. 76 S.W.3d 68, 73–75 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) (viewing time of day, whether businesses were closed, and past criminal activity independently from each other and determining that no one fact was by itself sufficient to give rise to probable cause). The majority used precisely the "divide and conquer" analysis rejected by the Supreme Court in *United States v. Arvizu*. *See* 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase."). Indeed, the majority did not cite *Arvizu* at all, and the dissent noted that the majority's piecemeal approach had been rejected by *Arvizu*. 76 S.W.3d at 78 (Brister, J., dissenting).

Further, both *Klare* and *Cronin v. State*, a case from this Court with somewhat similar facts, involved vehicles seen in parking lots that were observable from public roadways.

*See Cronin v. State*, No. 03–04–00266–CR, 2005 Tex.App. LEXIS 10450, at *18–19, 2005 WL 3440745, at *6-8 (Tex.App.-Austin Dec. 16, 2005, no pet.) (op. on reh'g, Law, C.J., dissenting) (mem. op., not designated for publication); *Klare*, 76 S.W.3d at 71. Tanner and his companion, on the other hand, were seen walking from behind a private business, and there is nothing in the record to show that there was a public parking lot or other public access behind the bar, nor was there any showing that the area from which Tanner walked was in any way viewable from a public roadway. There is a considerable difference between an officer stopping a vehicle seen parked in a public parking lot, *see Klare*, 76 S.W.3d at 71, or a person walking late at night along a public sidewalk, *see Gamble v. State*, 8 S.W.3d 452, 453–54 (Tex.App.-Houston [1st Dist.] 1999, no pet.), and an officer stopping someone seen walking from behind private property well after the business was closed. *See Cronin*, 2005 Tex.App. LEXIS 10450, at *15, 2005 WL 3440745, at *1 (reasonable suspicion to stop car that drove from dark area behind restaurant that had been closed for several hours).

tion upon which to base an arrest is not required to "simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *see also Terry,* 392 U.S. at 23, 88 S.Ct. 1868 (describing facts of stop and stating that "[i]t would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further"). Had the owner of the Lone Star Bar arrived the next morning to find that his business had been robbed or vandalized, it is unlikely he would have been reassured to learn that Officer Maldonado did not stop the two people he saw walking from behind the closed bar at 3:00 a.m. The trial court in this case did not err in determining that Officer Maldonado's behavior was supported by reasonable suspicion. We overrule Tanner's sole issue on appeal and affirm the trial court's judgment.

Dissenting opinion by Justice HENSON.

DIANE HENSON, Justice, dissenting.

In deciding this case, the majority falls prey to the danger of empowering law enforcement to such a degree that the Fourth Amendment rights of Texas citizens, innocent and guilty alike, are cast aside.

While the machinery of law enforcement and indeed the nature of crime itself have changed dramatically since the Fourth Amendment became part of the Nation's fundamental law in 1791, what the Framers understood then remains true today—that the task of combating crime and convicting the guilty will in every era seem of such critical and pressing concern that we may be lured by the temptations of expediency into forsaking our commitment to protecting individual liberty and privacy.

*United States v. Leon,* 468 U.S. 897, 929–30, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (Brennan, J., dissenting).

The Fourth Amendment to the U.S. Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Wherever an individual has a reasonable expectation of privacy, he is entitled to be free from unreasonable governmental intrusion, and this "inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio,* 392 U.S. 1, 8–9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This inestimable right of personal security is severely eroded when a law enforcement officer may detain any individual who happens to be near a closed business at a late hour.

As the majority notes, in reviewing whether reasonable suspicion exists to justify an investigative detention,[1] we must look only at those facts known to the officer at the inception of the stop—a stop or search unlawful at its inception may not be

---

1. An investigative detention is distinguishable from a consensual encounter, which does not infringe on a constitutional right and requires no justification. *Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). An officer without reasonable suspicion of criminal activity may question an individual during a consensual encounter, "as long as the person to whom questions are put remains free to disregard the questions and walk away." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). However, an investigative detention occurs when a person's freedom of movement is restrained, either by physical force or a show of authority. *Johnson v. State,* 912 S.W.2d 227, 234 (Tex.Crim.App.1995). An investigative detention constitutes a seizure and invokes constitutional safeguards. *Mendenhall,* 446 U.S. at 553, 100 S.Ct. 1870.

validated by what it turns up. *See Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). If an officer stops an individual based merely on a hunch that the individual is "up to no good," the fact that the hunch turns out to be correct does not retroactively validate the stop.

The majority's insistence that a determination of reasonable suspicion must be made without referring to cases with similar facts disregards the fundamental principles of a legal system based on precedent. While it is true that the U.S. Supreme Court stated in *Ornelas v. United States,* 517 U.S. 690, 698, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), that a reasonable-suspicion inquiry is "multifaceted," and that determinations made in other cases " 'will seldom be a useful "precedent" for another,' " it went on to say, "[b]ut there are exceptions," such as cases that are so factually similar that it would be inconsistent to decide one differently from the other. "After all, treating like cases alike is the great engine of the law." *Taber v. Maine,* 67 F.3d 1029, 1038 (2d Cir.1995).

We have such a factually similar case in *Gamble v. State,* 8 S.W.3d 452, 453–54 (Tex.App.-Houston [1st Dist.] 1999, no pet.), which not only involved "suspicious surroundings," which the majority insists are sufficient to establish reasonable suspicion, but also included "suspicious" behaviors by the subject that are not present in our case. In *Gamble,* the court found that reasonable suspicion was not established where an individual was walking at 3:00 a.m. in an area with a history of drug sales near a residence where police had recently been called several times, and the subject repeatedly turned around to watch a police car, then began walking away when the car turned in his direction. *Id.* at 453–54.

By maintaining that reasonable suspicion was established by the fact that Tan-

ner was coming from behind a closed business establishment at 3:00 a.m. in an unlit area, the majority chooses to ignore the reasonable-suspicion standards used in *Gamble* and *Klare v. State,* 76 S.W.3d 68, 75 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd). In *Klare,* the fact that an individual was observed in close proximity to a closed business establishment at 2:30 a.m. was insufficient to establish a reasonable suspicion.

The majority criticizes *Klare,* claiming that there are "errors in its analysis." However, the court in *Klare* did not, as the majority suggests, view the factors of time of day, proximity to closed businesses, and criminal activity in the area independently from each other in determining whether reasonable suspicion existed. The *Klare* court viewed these considerations as "facts which focus on the suspect's surroundings rather than on the suspect himself," so that while such factors are relevant, "an additional fact or facts particular to the suspect's behavior" are required to justify reasonable suspicion. *Id.* at 75. The court examined an array of cases to determine whether under the totality of the circumstances, the time of day, the fact that businesses nearby were closed, and recent criminal activity in the area could be sufficient to establish reasonable suspicion. Only then did the court determine that where other Texas courts have found reasonable suspicion, additional factors were present beyond those related to the suspect's surroundings, stating that "[i]n the instant case, there are fewer facts on which to base reasonable suspicion." *Id.* at 76.

*Klare,* which has not been overruled, was cited favorably by this Court in *Cronin v. State,* No. 03–04–00266–CR, 2005 Tex.App. LEXIS 10450, at *14–15, 2005 WL 3440745, at *5-6 (Tex.App.-Austin Dec. 16, 2005, no pet.) (mem. op., not designated

for publication).[2] *Klare* has also been cited favorably by other appellate courts. *See Young v. State*, 133 S.W.3d 839, 843 (Tex.App.-El Paso 2004, no pet.) (holding that reasonable suspicion did not exist where officers pulled over car that had been seen leaving house that was under surveillance for narcotics activity); *McCarty v. State*, No. 11–02–00003–CR, 2003 Tex.App. LEXIS 1976, at *4–5, 2003 WL 757132, at *1-2 (Tex.App.-Eastland Mar.6, 2003, no pet.) (mem. op., not designated for publication) (holding that factors related to vehicle's surroundings, such as time of day, coupled with fact that officer recognized occupant as suspect in local burglary, established reasonable suspicion to detain vehicle).

The majority attempts to distinguish *Klare* and *Gamble* from the instant case by emphasizing that Tanner was not walking on a public sidewalk or parking lot that was observable from a public roadway. However, the record does not support this assertion—it contains no indication that Tanner was on private property at the time he was observed by Maldonado. Maldonado's testimony establishes only that Tanner came "from a dark area behind the bar."

The U.S. Supreme Court has also taken the view that factors related to the suspect's surroundings alone are not sufficient to establish reasonable suspicion, stating that there are two elements that must be present before a stop is permissible: (1) there must be an assessment "based upon all of the circumstances," which include "the modes or patterns of operation of certain kinds of lawbreakers," from which "a trained officer draws inferences and makes deductions," and (2) this assessment must "raise a suspicion that the *particular individual* being stopped is engaged in wrongdoing." *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (emphasis added). Maldonado may have determined that the location and time of night made Tanner's presence suspicious, based on the patterns of operation of certain kinds of lawbreakers. However, the second element of the *Cortez* test has not been met where there are no factors present that raise a suspicion that Tanner, as a particular individual, was engaged in wrongdoing.

Tanner's presence at that particular time and location was not necessarily suspicious in light of the circumstances. There was no testimony to establish that this was a high-crime area or that the vicinity had a history of burglaries, vandalism, or drug trafficking. The record does not contain evidence, such as reports of broken windows or burglar alarms, that would suggest that criminal activity had taken place in or around the Lone Star Bar that particular early morning. Maldo-

2. The facts in this case are distinguishable from those that resulted in a finding of reasonable suspicion in *Cronin*. In *Cronin*, this Court emphasized that in addition to the fact that the subject drove an automobile out from behind a closed business late at night, (1) there had been recent unsolved vandalism in the area, (2) there had been a complete absence of vehicles in the area after midnight for the past two months, (3) the vehicle emerged from a concealed area behind a closed business that did not serve as a thoroughfare, so that the subject could not have been cutting through from another road, and (4) the arresting officer articulated each of these factors. *Cronin v. State*, No. 03–04–00266–CR, 2005 Tex.App. LEXIS 10450, at *16–17, 2005 WL 3440745, at *5-6 (Tex.App.-Austin Dec. 16, 2005, no pet.) (mem. op., not designated for publication). None of these factors are reflected in the record before us. Furthermore, Chief Justice Law, who inexplicably joins in the majority opinion today, dissented in *Cronin*, stating that reasonable suspicion was not established where "the State presented no additional facts beyond Cronin's presence in a parking lot of a closed business at 1:30 a.m." *Id.* 2005 Tex.App. LEXIS 10450, at *23, 2005 WL 3440745, at *6 (Law, C.J., dissenting).

nado testified that the Lone Star Bar typically closes between 1:30 and 2:00 a.m. and that he was not aware of how long it would take bar employees to close down the establishment after closing time. It would not seem unreasonable for employees of the Lone Star Bar to be exiting the building around 3:00 a.m. after completing a shift. Furthermore, Maldonado observed Tanner and his companion cross a major roadway and head in the direction of a residential area, which is consistent with the expected activity of employees returning to their homes after work. The act of walking bikes from behind a closed business establishment, particularly at an hour when it could be expected that employees would be leaving the establishment, does not warrant a reasonable suspicion of criminal activity without additional facts.

The majority makes note of Maldonado's testimony that his suspicions increased when Tanner's companion stopped soon after Maldonado flashed his patrol car's lights, but Tanner continued walking until Maldonado drove up to him. After Maldonado called out to him, however, Tanner merely continued walking without changing his pace or direction and there is nothing in the record to indicate when Tanner first saw the lights or heard Maldonado.

While flight from a show of authority may be a factor in determining whether there is reasonable suspicion, flight must "be considered in context of the surrounding circumstances," including whether the subject exhibited suspicious activity. *State v. Perez,* 56 S.W.3d 796, 799 n. 1 (Tex. App.-Eastland 2001) (citing *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)), *rev'd on other grounds,* 85 S.W.3d 817 (Tex.Crim.App. 2002). In *Wardlow,* reasonable suspicion was established when an individual standing next to a building holding an opaque bag in an area known for heavy narcotics

trafficking turned and ran in the opposite direction after looking in the direction of police officers. 528 U.S. at 122, 120 S.Ct. 673. Tanner's action of continuing to walk his bike at the same pace and in the same direction is unlike the unprovoked headlong flight described in *Wardlow* to justify a stop. Furthermore, Tanner's action of walking away at the same pace and direction without looking over his shoulder or otherwise acknowledging the police presence does not rise to the level of sudden flight in the presence of a police officer that is typically used to establish reasonable suspicion. *See, e.g., United States v. Silva,* 957 F.2d 157, 158 (5th Cir.1992) (subject "broke into a run" when spoken to by officer); *Brooks v. State,* 76 S.W.3d 426, 429 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (subject jumped from his car and ran away when officer tried to stop him); *Reyes v. State,* 899 S.W.2d 319, 324 (Tex. App.-Houston [14th Dist.] 1995, pet. ref'd) (subject "took off running" when police asked to speak with him). Here, there is no evidence that Tanner broke into sudden, unprovoked flight in an attempt to run away from authorities or that the surrounding circumstances indicated that Tanner was exhibiting suspicious activity of any kind.

The majority points out that Tanner's Fourth Amendment rights must be weighed against the governmental interest in the prevention and detection of theft and other crime. While the threat of theft and other crime does create a governmental interest, "the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." *City of Indianapolis v. Edmond,* 531 U.S. 32, 42, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). The record does not reflect that criminal activity had recently taken place in the area, or that Tanner was in the process of burglarizing a business or

intended to do so in the future. Furthermore, Tanner and his companion were pushing bicycles, rather than driving a car that could more easily conceal the fruits of criminal activity, and appear to have been empty-handed. Maldonado did not claim that he suspected Tanner of being involved in a burglary, or even that he suspected Tanner of any specific crime.[3] *See Brown v. Texas,* 443 U.S. 47, 49, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (holding that reasonable suspicion was not established where officers detained subject walking in alley in high-crime area and noting that "officers did not claim to suspect appellant of any specific misconduct"). The majority insists upon intruding on Tanner's Fourth Amendment rights for the purpose of preventing a hypothetical burglary. Absent additional factors beyond the time of day and nearby closed business that would suggest that Tanner was involved in criminal activity, there was not a governmental interest strong enough to outweigh Tanner's Fourth Amendment interests.

In light of the lack of reasonable suspicion for detaining Tanner, the trial court should have granted Tanner's motion to suppress evidence obtained as a result of the detention and search. Once a suspect has been lawfully detained for investigation, the officer may conduct a limited search for weapons where it is reasonably warranted for his safety and the safety of others, even in the absence of probable cause. *Rodriguez v. State,* 975 S.W.2d 667, 675–76 (Tex.App.-Texarkana 1998, pet. ref'd). However, Tanner was unlawfully detained at the time of Maldonado's pat-down search for weapons, and "evidence obtained as the fruit of an unconstitutional seizure is inadmissible." *Hernandez v. State,* 963 S.W.2d 921, 924 (Tex. App.-San Antonio 1998, pet. ref'd). Accordingly, evidence discovered as a result of the weapons search should have been deemed inadmissible, regardless of whether the search was reasonably warranted.[4]

Because Maldonado has not pointed to specific, articulable facts creating a reasonable suspicion that Tanner was involved in criminal activity, common sense would counsel us that the showing here is insufficient. As a result, I cannot join the majority in finding that the investigative detention was not a violation of Tanner's rights under the Fourth Amendment. Because I believe that the trial court erred when it denied Tanner's motion to suppress evidence, I respectfully dissent.

3. While Tanner had two knives of legal size clipped to his belt, Maldonado did not observe these knives until after stopping Tanner. Reasonable suspicion must be established based on the facts "available to the officer *at the moment of seizure.*" *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (emphasis added).

4. After the pat-down search for additional weapons, Maldonado performed a second search that revealed the methamphetamine. Voluntary consent to search is a well-established exception to the requirements of both a warrant and probable cause. *Carmouche v. State,* 10 S.W.3d 323, 331 (Tex.Crim.App.

2000) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). While patting down Tanner for additional weapons, Maldonado asked Tanner if he was holding additional contraband, and according to Maldonado's arrest warrant affidavit, Tanner voluntarily consented to search at this time. However, even if Tanner voluntarily consented to search, his consent was invalid because it resulted from an unlawful detention. If consent to search is given during an unlawful detention, any evidence seized is inadmissible because the validity of the consent is dependent on the validity of the detention. *Viveros v. State,* 828 S.W.2d 2, 4 (Tex.Crim.App.1992).