TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-06-00231-CR






Pamela Rose Franks, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT

NO. D-1-DC-05204815, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING






O P I N I O N


 Appellant Pamela Rose Franks was convicted after pleading guilty to possession of
less than one gram of cocaine. See Tex. Health & Safety Code Ann. § 481.102(3)(D) (West Supp.
2006), § .115(a), (b) (West 2003). In her sole point of error, appellant contends that the trial court
erred in denying her motion to suppress evidence "because the seizure and search was unreasonable
and did not fall within the community-caretaking exception of the warrant requirement of the Fourth
Amendment of the United States Constitution or Article I, section 9 of the Texas Constitution." See
U.S. Const. amend. IV; Tex. Const. art. I, § 9; Cady v. Dombrowski, 413 U.S. 433, 441 (1973);
Wright v. State, 7 S.W.3d 148, 151 (Tex. Crim. App. 1999). Based on this record, we conclude that
appellant's detention was not justified by the officer's reasonable suspicion of appellant's
involvement in criminal activity or the officer's exercise of his community-caretaking function. We
reverse the judgment and remand this case to the district court.

BACKGROUND

 The only witness who testified at the February 16, 2006 suppression hearing
was Austin Police Department Officer Zachary LaHood. He stated that while responding to a
daytime call about a collision, he drove near the "Y" in Oak Hill--where Highways 290 and 71
intersect--and noticed a black Toyota Camry sedan parked just off the highway at a rest area with
a picnic table. In the evening, he passed through that part of Austin again and observed the "same
vehicle parked there." He found that odd, but he was busy and "didn't have time to check it out." 
The next day, en route to another collision, he saw the "same vehicle parked in the same spot,"
which raised his suspicion that the car might have been abandoned, stolen, or broken down. He did
not note the license-plate number of the car that he had seen while driving by the rest area, but he
planned to return later in the day and look into the situation if the car remained there.

 After dark that evening, Officer LaHood observed the "same vehicle" at the rest area. 
The rest area did not have any lighting, and except for one car, it was unoccupied. LaHood decided
to conduct a "check welfare" stop. As he parked his patrol car behind the car at the rest area,
LaHood noticed that the dome light that had been activated in the parked car was turned off. "As
soon as" he saw the dome light go out, he activated the overhead lights on his patrol car "to conduct
a stop." When the lights were on, he saw that there was a person inside the parked car.

 LaHood approached the car (which had its engine running), introduced himself to the
driver, appellant, and explained that he was talking to her because he had observed her car at the rest
area four times in the last twenty-four hours--during the day and at night. Appellant was "visibly
upset"--she was crying, her breathing was "fast" and "shallow," and she "appeared to be very
anxious" and "nervous." At the outset, as appellant was crying and upset, she asked the officer
"several times [, C]an I just go, can I just go[?]" He testified that he replied, "[N]o, you can't go. 
You are upset. I want to find out why you are upset, what [is] wrong." LaHood testified that from
the moment of his first contact with appellant at the car door, "it became more and more apparent
that she was becoming more anxious and agitated." Appellant informed him that she was having
marital problems. Because of this information and her upset condition, LaHood thought that
she might have been assaulted by her husband. While he was talking to her, LaHood saw some
unspecified "objects" in the back seat and floorboard of her car. He then asked appellant for her
driver's license. She stated that she had an identification card, but she did not have a driver's
license. He asked appellant whether she was alone, and becoming more upset, she admitted that no
one else was with her.

 Not wanting her to drive away without a driver's license, LaHood asked appellant to
step out of her car, and she complied. Then while speaking with the officer, appellant had a
"wardrobe malfunction" and exposed one of her breasts. LaHood told her to correct it. Officer
Seago, a female officer seated in the patrol car, witnessed the incident and walked over toward
LaHood and appellant.

 As appellant and Seago conversed at the rear of appellant's car, LaHood began
shining his flashlight on the back seat and driver's seat of the car. Seeing this, appellant "bee-lined"
toward the car, placing herself between LaHood and the driver's side door. He asked her to return
to the back of the car, and she initially did so, but when the officer continued shining his flashlight
inside her car, she again positioned herself in front of the driver's side door, becoming more anxious. 
LaHood asked her again to stand back with the other officer.

 When LaHood looked inside appellant's car this time, he saw several uninflated
balloons, empty soda cans, wadded up paper towels, and packages of flavored sexual lubricant on
the car's rear floorboard. He knew that balloons were commonly used to transport heroin and that
soda can bottoms were used as dishes in which to cook narcotics. Based on the lubricant and paper
towels, he thought that it was possible that appellant was "running prostitution activities out of the
vehicle." On the driver's side floorboard he saw an empty balloon and what he believed was a "push
rod." A push rod, he explained, is a metal rod used to shove narcotics inside a pipe or to scrape it
down after its use.

 LaHood apparently halted his viewing of the car when appellant claimed to have been
prescribed medication for suicidal thoughts and stated that she was not taking her medication. Her
disclosure triggered the police policy requiring the officers to immediately summon a suicide-intervention officer to the scene. After interviewing appellant, the responding intervention officer,
Torres, determined that appellant did not require commitment.

 At the completion of Torres's interview, LaHood planned to release appellant and
issue a "field observation card" to her, but she could not drive from the scene because Department
of Public Safety records confirmed that her driver's license had been suspended. Appellant placed
a telephone call to her husband to get a ride and arrange to remove her car from the rest area. 
LaHood testified that to prevent appellant from hurting herself or the officers, he wanted to confirm
that her car did not contain any weapons before allowing her to return to it. He thought that firearms
or other weapons might have been in the car for two reasons: first, because appellant had already
admitted to having suicidal thoughts; and second, because he had personally encountered loaded
weapons in vehicles during prostitution stings, and he thought appellant's car could have been used
for prostitution activity. He proceeded to "frisk" the car for weapons. The "frisk," he explained, was
distinct from a search because he did not "go into any containers or anything like that"; he was only
"looking for a spot where a weapon could be placed," such as under the seat or floor mat.

 During this "frisk," LaHood looked at the front passenger seat and saw appellant's
large, unzipped purse, which he thought would easily conceal a handgun. Illuminated by his
flashlight and on top of the purse was a pipe, commonly used to smoke marijuana, with marijuana
residue on it. At that point, he determined that appellant would be arrested for possession of drug
paraphernalia. Further search of appellant's car after her arrest revealed a case in the pocket of the
driver's side door containing .7 grams of crack cocaine.

 Appellant was subsequently indicted for possession of cocaine and filed a motion to
suppress evidence. After the district court denied the motion, appellant pleaded guilty. This appeal
followed.


DISCUSSION


 In her sole point of error, appellant contends that the court erred in denying her
motion to suppress evidence "because the seizure and search was unreasonable and did not fall
within the community-caretaking exception of the warrant requirement of the Fourth Amendment
of the United States Constitution or Article I, section 9 of the Texas Constitution." See U.S. Const.
amend. IV; Tex. Const. art. I, § 9; Cady, 413 U.S. at 441; Wright, 7 S.W.3d at 151. The State
contends that LaHood's initial contact with appellant was not a detention but an encounter, that
LaHood's brief detention of appellant was justified by reasonable suspicion, and alternatively, that
the detention was justified by LaHood's exercise of his community-caretaking function.

 We review a trial court's ruling on a motion to suppress under a bifurcated standard
of review, giving almost total deference to the trial court's determination of historical facts
and reviewing the court's application of search and seizure law de novo. See Wiede v. State,
214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007). When, as here, the trial court does not enter findings
of fact, we "view the evidence in the light most favorable to the trial court's ruling and assume that
the trial court made implicit findings of fact that support its ruling as long as those findings are
supported by the record." Id. at 25 (quoting Ross v. State, 32 S.W.3d 853, 855 (Tex. Crim. App.
2000)). If the ruling on the motion to suppress is reasonably supported by the record and is correct
under any theory of law applicable to the case, we must uphold the ruling. State v. Steelman,
93 S.W.3d 102, 107 (Tex. Crim. App. 2002) (citing Romero v. State, 800 S.W.2d 539, 543-44
(Tex. Crim. App. 1990)).


Detentions and encounters

 Both the Fourth Amendment and article I, section 9 of the Texas Constitution protect
individuals from unreasonable searches and seizures. See U.S. Const. amend. IV; Tex. Const. art.
I, § 9. Because appellant has not argued that article I, section 9 affords her with protection that is
distinct from that of the Fourth Amendment, we treat them as providing the same protection and
consider them jointly. See Johnson v. State, 912 S.W.2d 227, 233-34 (Tex. Crim. App. 1995)
("[F]ramers of the Texas Constitution chose to draft Art. I, § 9 to protect Texas citizens from
unreasonable searches and seizures by the state in the same way they were protected from
unreasonable searches and seizures by the federal government.").

 Appellant argues that she was illegally seized by LaHood because she was detained
without a reasonable suspicion of involvement in criminal activity. A police officer may stop
and briefly detain a person for investigative purposes if, under the totality of the circumstances,
the officer has reasonable suspicion supported by articulable facts that the person detained is, has
been, or soon will be engaged in criminal activity. Terry v. Ohio, 392 U.S. 1, 21-22 (1968); Ford
v. State, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). An investigative detention occurs when an
individual is confronted by a police officer, yields to the officer's display of authority, and is
temporarily detained for purposes of an investigation. Johnson, 912 S.W.2d at 235. Whether
reasonable suspicion exists is determined by considering the facts known to officer at the time of the
detention. See Terry, 392 U.S. at 21-22 (stating that seizure's reasonableness is based on "facts
available to the officer at the moment of the seizure"); see also Davis v. State, 947 S.W.2d 240, 243
(Tex. Crim. App. 1997); Tanner v. State, No. 03-06-00217-CR, 2007 Tex. App. LEXIS 4864, at *10
(Tex. App.--Austin June 20, 2007, no pet.).

 Detentions are distinct from encounters. Encounters are consensual interactions
between citizens and police that do not require reasonable suspicion and do not implicate
constitutional rights. See Florida v. Royer, 460 U.S. 491, 497-98 (1983). Encounters occur when
police officers approach an individual in a public place to ask questions, request identification, or
request consent to search as long as the interaction is consensual--that is, as long as an officer does
not convey a message that compliance with the officer's request is required. Florida v. Bostick,
501 U.S. 429, 434-35 (1991) (holding that encounters are consensual if "reasonable person would
feel free 'to disregard the police and go about his business'" (quoting California v. Hodari D.,
499 U.S. 621, 628 (1991))); see also Hunter v. State, 955 S.W.2d 102, 104 (Tex. Crim. App. 1997)
(holding that citizen's encounter with officer was consensual because a reasonable person would
have felt free to walk away).


Appellant's interaction with LaHood

 In support of her argument that she was illegally seized, appellant states that LaHood
decided to stop her and detained her by parking his patrol car behind her car at the rest area,
activating the overhead lights on his car, and refusing her request to leave. Based on the chronology
of events presented in this record, we conclude that the interaction between LaHood and appellant
was an encounter that progressed to an investigative detention when her request to leave was refused.

 Appellant's car was parked at the rest area when LaHood first approached it. Because
LaHood thought that he had observed "the same vehicle parked in the same spot" at random hours
of the day and night, he believed that it might have been abandoned, stolen, or broken down. His
initial investigation of the car's status did not require any justification.

 The initial interaction between LaHood and appellant, after he approached the car,
was an encounter. Although LaHood parked his vehicle behind appellant's, nothing in the record
suggests that the position of his vehicle blocked hers or prevented appellant from leaving the rest
area by simply driving forward. Moreover, appellant does not allege that the patrol car's siren was
activated, that she received any command over the patrol car's loudspeaker, or that LaHood told her
to turn off her car's engine when he approached.

 Appellant's argument that she was detained based on LaHood's activation of
the overhead lights on the patrol car is not determinative. LaHood testified that he activated
the overhead lights on his patrol car to illuminate the rest area, which did not have any lighting. Use
of the patrol car's overhead lights in an area that appeared dark and unoccupied except for a single
car does not necessarily constitute a detention. See Martin v. State, 104 S.W.3d 298, 301
(Tex. App.--El Paso 2003, no pet.) (concluding that officer's use of overhead lights did not
necessarily cause encounter to become stop).

 However, the initial encounter between LaHood and appellant progressed to an
investigative detention when LaHood refused appellant's request to leave. Before LaHood told
appellant, "[N]o, you can't go," he knew only that she was crying and that she was seated in a car
that he thought he had seen several times at the rest area. He did not testify about specific facts
leading him to suspect that appellant was, had been, or soon would be engaged in criminal activity. 
Although LaHood wondered whether the car might have been stolen, he never questioned appellant
about the car's ownership, and he did not state that appellant was detained because he suspected that
she was a car thief. Instead, he told her that she could not leave and that he wanted to find out why
she was upset.

 The State notes that "at some point," appellant informed LaHood that her driver's
license had been suspended and that appellant's failure to produce a driver's license would
have given the officer reasonable cause to detain her, as well as probable cause for her arrest. See
Tex. Transp. Code Ann. §§ 521.021 (prohibiting operation of motor vehicle on highway without
driver's license), .461 (West 2007) (punishable as misdemeanor offense). But the record reflects
that LaHood did not inquire about appellant's driver's license until after he had refused her request
to "just go."

 Relying on Carey v. State, 855 S.W.2d 85, 87 (Tex. App.--Houston [14th Dist.]
1993, pet. ref'd), the State argues that despite appellant's request to leave, LaHood was permitted
to "ask her to wait for him to check her identification" because a police officer may briefly stop a
suspicious individual to determine the individual's identity or to maintain the individual's status quo
while obtaining more information. The State also argues that LaHood had reason to view appellant
as a "suspicious individual" and asserts that the demeanor of the suspect in Carey and that of
appellant in this case are comparable. We disagree.

 In Carey, the suspect's detention was supported by the officer's reasonable suspicion,
stemming from his knowledge of specific facts: (1) he knew that the apartment complex was located
in a high-crime area; (2) he knew that the area was well known for drug trafficking; (3) he was
informed by the manager of an apartment complex about two strangers who were in an unfamiliar
car in the apartment's parking lot that night; and (4) he located the suspect inside a car in the parking
lot of the apartment complex. Id. at 86-87. There was also testimony that during the officer's
questioning, the suspect became "very nervous, began sweating, began looking around in several
directions and evaded the officer's questions." Id. at 86.

 Here, unlike the officer in Carey, LaHood was not acting on a reliable tip about a
suspicious person, nor was there any testimony characterizing the rest area as a high-crime area or
a scene of known drug trafficking. Appellant's nervousness and crying do not rise to the same level
of anxiety demonstrated by the suspect in Carey. In any event, the court in Carey did not justify the
suspect's detention based solely on his unusual behavior but in the context of all the information that
the officer had at the time of the stop. We further note that, contrary to the State's suggestion, this
record does not reflect that LaHood "asked appellant to wait." He told her at the outset, "[N]o, you
can't go." It was not an inquiry.

 Considering the totality of these circumstances in the light most favorable to the trial
court's ruling, we conclude that LaHood's initial interaction with appellant was an encounter but his
subsequent statement to appellant, "[N]o, you can't go," conveyed a message that she was not free
to leave and constituted a detention. See Hunter, 955 S.W.2d at 104. We further conclude, based
on this record, that when LaHood refused to allow appellant to leave, he did not have reasonable
suspicion to detain her. Accordingly, we must consider whether LaHood's detention of appellant
was justified by the Fourth Amendment's community-caretaking exception.


Community caretaking

 Appellant contends that she was illegally seized when LaHood declined her request
to leave and that her detention was not justified by LaHood's community-caretaking function. We
agree. Under the community-caretaking exception to the Fourth Amendment, and as part of their
duty to "serve and protect," police officers "may stop and assist an individual whom a reasonable
person--given the totality of the circumstances--would believe is in need of help." Wright,
7 S.W.3d at 151. A community-caretaking stop does not require the officer to have reasonable
suspicion or probable cause to believe that an offense has been committed. See Corbin v. State,
85 S.W.3d 272, 276 (Tex. Crim. App. 2002). The exception stems from the recognition that a police
officer's duties involve activities other than gathering evidence, enforcing the law, and conducting
investigations. See Cady, 413 U.S. at 441; Wright, 7 S.W.3d at 151. Because the community-caretaking function is "totally divorced from the detection, investigation, or acquisition of evidence
relating to the violation of a criminal statute," Cady, 413 U.S. at 441, a police officer may not
properly invoke his community-caretaking function if he is primarily motivated by a
non-community-caretaking purpose. Corbin, 85 S.W.3d at 277. While recognizing the existence
of the community-caretaking exception, the Texas Court of Criminal Appeals has emphasized "its
narrow applicability." Wright, 7 S.W.3d at 152.

 Assessing the applicability of the community-caretaking exception requires a
dual inquiry: first, whether the police officer was primarily motivated by a community-caretaking
purpose; and second, whether the officer's belief that the individual needed help was reasonable. 
See Corbin, 85 S.W.3d at 277. In this case, the trial court heard testimony that appellant's car had
been observed four times, day and night, parked in the same spot at a rest area, leading LaHood to
suspect that the car might have been broken down or abandoned. The court also heard testimony that
when LaHood saw appellant, she was crying, "really upset," and informed him that she was having
marital problems. LaHood also testified that appellant became increasingly "anxious and agitated,"
and he denied that there was any point at which appellant calmed down or that he ceased being
concerned about her agitation. Her behavior suggested that she might have been assaulted,
and LaHood wanted to find out what was wrong. As the fact finder and the exclusive judge of
credibility, the court could have determined that when LaHood refused to allow appellant to leave
the scene, he was primarily motivated by a community-caretaking purpose. See id.

 Next, we must decide whether the officer's belief that appellant needed help was
reasonable. See id. (citing Wright, 7 S.W.3d at 151-52). To evaluate the reasonableness of the
officer's belief, we consider four non-exclusive factors: (1) the nature and level of the distress
exhibited by the individual; (2) the location of the individual; (3) whether the individual was alone
and/or had access to assistance other than that offered by the officer; and (4) to what extent the
individual, if not assisted, presented a danger to himself or others. Id. (citing Wright, 7 S.W.3d at
152). The first factor, although not always dispositive, is entitled to the greatest weight: "the greater
the nature and level of distress exhibited, the more likely police involvement will be a reasonable
exercise of the community caretaking function." Id. The remaining factors "give more definition
to the first factor" because, based on their presence or absence, "a particular level of exhibited
distress may be seen as more or less serious." Id.

 The first factor, the level of the individual's exhibited distress, weighs against
appellant's detention. According to the record, appellant was crying, nervous, and breathing rapidly
and reported having marital problems. On cross-examination, LaHood recalled that appellant had
"tears from her eyes" and "sniffles" and appeared "emotionally upset about something." LaHood
speculated that she might have been assaulted, but he did not ask her about it. Nor is there any
evidence in the record demonstrating that appellant had bruises, scratches, or other signs of physical
abuse. At the time he detained appellant, the only evident distress was her "emotionally upset"
condition. We conclude, on this record, that appellant did not exhibit a level of distress justifying
LaHood's belief that she needed assistance.

 The second factor, the individual's location, also weighs against appellant's detention. 
The record shows that LaHood discovered appellant at a rest area that was near the intersection of
two highways. LaHood passed this location multiple times while he was en route to investigate
accidents. The record does not show that this location was unsafe or isolated from traffic,
businesses, and residences. See Corbin, 85 S.W.3d at 278.

 The third factor, whether the individual was alone or had access to assistance,
supports appellant's detention. Appellant admitted that she was alone. Her access to other
assistance is questionable: she was discovered at an unoccupied and unlit rest area after dark in a
car that appeared to have been immobile for the preceding twenty-four hours at a location that lacked
sidewalks. Although she placed a telephone call from the scene--and LaHood testified that he "had
her on the phone" with her husband because she could not drive away from the scene--it is unclear 
whose telephone she used. The record does not clearly demonstrate that appellant had access to
assistance besides LaHood.

 The fourth factor, the extent to which the individual posed a danger to herself or
others if not assisted, weighs against appellant's detention. The record shows that at the time
LaHood detained appellant, he knew the following facts: appellant was crying and she was seated
in a car that LaHood thought he had seen previously parked at the rest area. Nothing in this record
shows that appellant posed a danger to herself or others during the time that she had been at the rest
area, or that she would have become a danger if LaHood had allowed her to leave the rest area when
she asked to go. Based on the facts in this record, we conclude that appellant's detention was not
objectively reasonable and therefore was not justified by LaHood's community-caretaking function. 
 Even when viewed in the light most favorable to the trial court's ruling, the evidence
in the record fails to show that appellant's detention was justified by LaHood's reasonable suspicion
or the exercise of his community-caretaking function. Because the trial court's ruling is not
reasonably supported by the record and is incorrect under both legal theories urged by the State, and
because the State failed to carry its burden, we conclude that the court erred in denying appellant's
motion to suppress. We sustain appellant's sole point of error.


CONCLUSION


 Having sustained appellant's sole point of error, we reverse the district court's
judgment and remand this case for further proceedings consistent with this opinion.


 

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Reversed and Remanded

Filed: September 18, 2007

Publish