# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-20-00552-CR

**The State of Texas, Appellant**

**v.**

**Samantha Leann Lamb, Appellee**

## FROM THE COUNTY COURT AT LAW NO. 2 OF HAYS COUNTY
## NO. 19-0974CR-2, THE HONORABLE CHRIS JOHNSON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Raising two issues, the State of Texas appeals from the trial court's order granting appellee Samantha Leann Lamb's motion to suppress evidence. Because we conclude that the trial court did not abuse its discretion in granting the motion, we affirm the order.

## BACKGROUND

Around midnight on November 15, 2018, Lamb was sitting in the driver's seat of her car with her headlights off in the driveway of a parking lot of a CVS store that was closed for business. Her car was parked parallel to the curb and facing in the direction of a traffic stop that was in progress across a multiple lane road. The traffic stop involved a driving while intoxicated (DWI) investigation of Lamb's friend.

After driving their patrol car to the in-progress traffic stop and speaking with Officer Tureaud who was involved in that stop, Officers Morenz and Duckworth drove their

patrol car without activating its emergency lights across the road to where Lamb's car was parked. The officers parked their patrol car with its headlights and overhead lights on close to and facing Lamb's car. After the officers got out of their car, Officer Duckworth approached on the driver's side, and Officer Morenz approached on the passenger's side. Both officers shined their flashlights on Lamb. As they approached, Officer Duckworth asked Lamb to display her hands. Shortly after that, he asked for her identification and keys and for her to exit her car. Neither officer told Lamb that she was free to leave. As a result of this encounter, Lamb was charged with DWI with an alcohol concentration level over 0.15.

Lamb filed a motion to suppress the evidence that was obtained during this encounter, asserting that she had been "involuntarily seized, arrested, restrained, detained, and taken into custody by the officer(s)," "who at the moment of such seizure, did not have reasonable suspicion nor probable cause authorizing such seizure of her person." The two witnesses at the hearing on the motion to suppress were Officers Morenz and Duckworth, and the exhibits included video recordings from Officer Duckworth's body camera and Officer Tureaud's body and in-car dash cameras.

Officer Morenz testified that sitting in a parked vehicle in a parking lot with the vehicle's headlights off was not a traffic offense and that it was not a crime to watch a traffic stop but that Lamb's car was suspicious because of "[t]he time of night and combination of . . . not having headlights on and watching a traffic stop." She testified that her "report notes that the vehicle was driving around without headlights on" in the parking lot and that the information about a "suspicious vehicle in the CVS parking lot" was reported by "the officers initiating the first traffic stop." She did not know when she was notified about this vehicle or "exactly what time that occurred," and she "[could not] say for certain" that Lamb's car was "the exact vehicle

2

that the other officers identified." She also testified that she turned her microphone off on her body camera when they were speaking with Officer Tureaud and failed to turn it back on.[1] Officer Duckworth testified that all that he could recall was that after they arrived at the in-progress traffic stop, the officer involved in that stop "called out something about another vehicle" that was "[j]ust driving and it was now parked across the street in the CVS parking lot." When asked about the positioning of that car, he testified that the "vehicle was sitting with its lights off in the driveway . . . to CVS facing the traffic stop." Neither officer testified that they observed Lamb operating her car without its headlights, nor could they remember being told that her car was being operated without headlights.

The video recordings are unclear whether Lamb drove her car with her headlights off in the CVS parking lot, but they show the officers crossing the road in their patrol car and parking close to and facing Lamb's parked car, and Officers Morenz and Duckworth exiting their vehicle and approaching Lamb's car on foot. In the video recording from Officer Duckworth's body camera, Lamb holds her hands up as the officers approach her car from both sides with their flashlights and the patrol car's headlights and overhead lights shining on her and her car. Officer Duckworth questioned her about "what [she] was doing over here," and she explained that she was trying to follow her friend home and thought he was in trouble. She answered "Yes," when Officer Duckworth asked her if she was coming from "where he was." Officer Duckworth then asked for her identification and keys and to step out of her car.[2]

---

[1] Officer Morenz testified, "It's policy whenever we break off to discuss something on scene, we mute our body cameras."

[2] The Court limited its consideration of the video recording from Officer Duckworth's body camera to before Lamb exits her car.

Following the hearing, the trial court signed the order granting Lamb's motion to suppress evidence and made findings of fact and a conclusion of law that the court's decision to grant the motion was "in the interest of justice in accordance with the law." This appeal followed.

## ANALYSIS

In two issues, the State argues that the trial court abused its discretion when it granted Lamb's motion to suppress evidence.

### Standard of Review

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). We view the record in the light most favorable to the trial court's determination, and "the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *Id.* (quoting *Dixon*, 206 S.W.3d at 590); *see State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

In general, we apply a bifurcated standard of review. *State v. Le,* 463 S.W.3d 872, 876 (Tex. Crim. App. 2015) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)); *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007) (citing *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005)). We give "almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Amador*, 221 S.W.3d at 673 (quoting *Guzman*, 955 S.W.2d at 89). We also apply this "deferential standard of review" to "a trial court's determination of historical facts when that determination is based on a videotape

4

recording admitted into evidence at a suppression hearing." *Id.* (quoting *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006)). Moreover, we "afford the same level of deference to a trial court's ruling on 'application of law to fact questions,' or 'mixed questions of law and fact,' if the resolution of those questions turns on an evaluation of credibility and demeanor." *Id.* (quoting *Montanez*, 195 S.W.3d at 107). We "review de novo 'mixed questions of law and fact' that do not depend upon credibility and demeanor." *Id.*

**When did the encounter between the officers and Lamb become a detention?**

In its first issue, the State argues that the trial court abused its discretion when it found that a detention occurred when Officers Morenz and Duckworth simultaneously approached Lamb "to inquire what [she was] doing in a closed business's parking lot at midnight." The State contends that at that point, the encounter between the officers and Lamb was consensual and not a detention.

Because there is a "wide diversity of police-citizen interaction, not every encounter between the two is subject to Fourth Amendment scrutiny." *Garcia-Cantu*, 253 S.W.3d at 242. "It is only when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen,' will courts conclude that a Fourth Amendment 'seizure' has occurred." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). "Such a seizure occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have 'communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* (quoting *Kaupp v. Texas*, 538 U.S. 626, 629 (2003)); *see Florida v. Bostick*, 501 U.S. 429, 439 (1991) (explaining that in order to determine whether particular encounter constitutes seizure, court "must consider all of

the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter"); *State v. Woodard*, 341 S.W.3d 404, 411 (Tex. Crim. App. 2011) (explaining that courts consider totality of circumstances of citizen-police encounter "to determine whether a reasonable person in the defendant's shoes would have felt free to ignore the request or terminate the interaction").

In contrast to a detention, a consensual encounter "takes place when an officer approaches a citizen in a public place to ask questions, and the citizen is willing to listen and voluntarily answer." *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010). "Determining whether specific facts amount to a detention under the Fourth Amendment or a consensual police-citizen encounter 'is subject to de novo review because that is an issue of law—the application of legal principles to a specific set of facts.'" *State v. Woodard*, 314 S.W.3d 86, 93 (Tex. App.—Fort Worth 2010) (quoting *Garcia-Cantu*, 253 S.W.3d at 241), *aff'd*, 341 S.W.3d 404 (Tex. Crim. App. 2011). "No bright-line rule governs when a consensual encounter becomes a seizure" but generally an encounter is no longer consensual "when an officer through force or a showing of authority restrains a citizen's liberty." *Woodard*, 341 S.W.3d at 411. Circumstances that may support a determination that a police-citizen encounter was a seizure "include the threatening presence of several officers, the officer's display of a weapon, physical touching of the citizen by the officer, the officer's words or tone of voice indicating that compliance with the officer's requests might be compelled, or flashing lights or blocking a suspect's vehicle." *Woodard*, 314 S.W.3d at 94 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *see Crain*, 315 S.W.3d at 49–50 (explaining that "[w]hen the court is conducting its determination of whether the interaction constituted an encounter or a detention, the court focuses on whether the

6

officer conveyed a message that compliance with the officer's request was required" and listing examples of circumstances that might support that seizure occurred).

The State argues that a detention did not occur when the officers approached Lamb, contending that her car "was not 'boxed-in' and unable to leave" and characterizing "the maneuver" that Lamb would have needed to make to leave as "at most, an inconvenience." The State also argues that the officers did not seize her by walking up to her parked car, that Officer Duckworth's "simple request" for Lamb to show her hands "was not an exertion of government authority sufficient to suggest a seizure," and that no other common circumstances existed to support a finding that a detention occurred. As support, the State relies on case law that presumes citizens know their rights. *See, e.g.*, *Wade v. State*, 422 S.W.3d 661, 667 n.19 (Tex. Crim. App. 2013) (stating that "the 'reasonable person' is assumed to have considerable fortitude").

Relevant to this issue, the trial court's findings of fact included:

5.    In their marked patrol unit, Officers Morenz and Duckworth pulled directly in front of the vehicle occupied by Samantha Lamb.

6.    Officers Morenz and Duckworth approached the driver and passenger sides, respectively, of the vehicle occupied by Samantha Lamb.

7.    Officer Duckworth verbally commanded Samantha Lamb to display her hands to Officers Morenz and Duckworth.

8.    Officers Morenz and Duckworth then detained and began questioning Samantha Lamb.

. . . .

34.    Contrary to Officer Morenz' testimony, the videos clearly show that Officers Morenz and Duckworth did not have to park directly in front of Lamb's vehicle, that there was more than ample space to the side of Lamb's vehicle for said officers to park.

7

35.     The officers' exhibition of authority, including parking directly in front of Lamb's vehicle leaving her no reasonable means of egress, approaching both sides of Lamb's vehicle, both officers clothed in distinctive police uniforms with service weapons visible, and Officer Duckworth commanding Lamb to display her hands to officers, would lead a reasonable person to feel they were not free to leave.

These findings are supported by Officer Duckworth's testimony and the video recordings. The video recordings show that the officers were in uniform; they parked the patrol car close to and directly facing the front of Lamb's car, which was parked parallel to the curb; and although it is not entirely clear from the recordings, Officer Morenz's service weapon appears to be visible.[3] Further, although Officer Morenz testified that she "truly did not have any other place to go" and that it was "not practical" "to try to drive behind [Lamb's] vehicle," the recordings show that the officers could have parked in a different location in the parking lot, including on the other side of the driveway from where Lamb's car was parked.

The video recording from Officer Duckworth's body camera also shows the patrol car's headlights and overhead lights shining on Lamb's car, and the officers shining their flashlights on Lamb as they approached. *See Crain*, 315 S.W.3d at 53 (considering evidence that patrol car's overhead lights were pointed in appellant's direction when officer "demanded that he 'come over here and talk to me'" in determination that appellant was illegally detained). And the recording shows Lamb raising her open hands as the officers approached. In his testimony describing the video recording, Officer Duckworth testified that Lamb "has her hands visible and open" because "[p]robably" he "asked her to, because just before this you can see her hands dipped to where [he could] no longer see them" and so he "believe[d]" he "told her to show her

---

[3] The State concedes that the officers "were probably wearing holstered weapons as part of their normal uniform when they approached [Lamb's] vehicle" but argues that "the record does not so evince."

8

hands." He also answered, "Yes," when asked if that was "the standard for any kind of interaction [he had] with anybody that [he was] stopping."

Given this evidence, the trial court reasonably found that the officers' conduct as they approached Lamb "would lead a reasonable person to feel they were not free to leave." *See id.*; *Garcia-Cantu*, 253 S.W.3d at 242 (explaining that seizure has occurred when officer, by show of authority, has in some way restrained liberty of citizen). Thus, we conclude that the record supports the trial court's findings concerning when the detention began. We overrule the State's first issue.[4]

**Did the officers have reasonable suspicion to detain appellee?**

In its second issue, the State argues that the trial court abused its discretion when it found that the "officers lacked reasonable suspicion in contradiction to both uncontroverted testimony and indisputable visual evidence, which shows a vehicle operating at night without headlights, at midnight, in the parking lot of a closed business, specifically positioning itself twice to watch an ongoing criminal investigation from close distance."

Because Lamb was detained without a warrant, it was the State's burden to establish reasonable suspicion. *See Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011) ("Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion."); *Ford*,

---

[4] As support for its position that a detention did not occur when the officers were approaching Lamb, the State relies on *Matthews v. State*, 431 S.W.3d 596 (Tex. Crim. App. 2014), but that case was not about *when* a detention began but whether the detention was supported by reasonable grounds at all. That case concerned whether the officers had reasonable suspicion to detain the appellant who was sitting in the driver's seat of a parked van late at night based on an anonymous tip that he "was selling 'crack' out of a white van parked in front of the store" in a "high-crime area, known for drug and weapons arrests." *Id.* at 600, 604–05.

158 S.W.3d at 492 (stating that when defendant establishes that seizure occurred without warrant, burden shifts to State to establish that seizure was reasonable). "A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Derichsweiler*, 348 S.W.3d at 914. This standard "looks to the totality of the circumstances" and "the cumulative information known to the cooperating officers at the time of the stop," asks "whether there was an objectively justifiable basis for the detention," and "disregards the actual subjective intent of the arresting officer." *Id*. "[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular non-criminal acts." *Id.* (quoting *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997)).

Relevant to this issue, the trial court's findings of fact included:

9.      Officer Morenz described the vehicle occupied by Samantha Lamb as suspicious due to the time of night, driving without headlights on, and watching a traffic stop.

10.      Officer Morenz agreed that sitting in a parked vehicle in a parking lot without headlights illuminated is not a traffic offense.

. . . .

12.      Officer Morenz admitted that she cannot say with any certainty that the vehicle occupied by Samantha Lamb was the same vehicle identified by other officers.

13.      Officer Morenz has no recollection of the substance of her conversation with Officer Tureaud.

14.      Officer Morenz had no recollection when she saw Lamb's vehicle with or without headlights.

15.      Officer Morenz had no recollection of when she was told Lamb's vehicle was being operated without headlights.

10

16.     Officer Morenz had no recollection of who may have told her Lamb's vehicle was being operated without headlights.

17.     Officer Duckworth never testified who may have said that Lamb's vehicle was being operated without headlights.

18.     Officer Duckworth never testified when he may have been told that Lamb's vehicle was being operated without headlights.

19.     Officer Duckworth thinks that his conversation with Officer Tureaud was just a brief update about the (unrelated) traffic stop.

20.     Officer Duckworth did not remember if he and Officer Morenz were called to the scene of the unrelated traffic stop or just happened across it.

21.     Officer Duckworth could remember only that a different officer made the (unrelated) traffic stop and then called out something about another vehicle.

22.     All that Officer Duckworth could recall about the other vehicle (Lamb's vehicle) was that it was just driving and now it was parked across the street in the CVS parking lot.

23.     Officer Duckworth had no recollection of being told by anyone that Lamb's vehicle was being operated without headlights.

24.     Officer Duckworth remembers the moment in time when he and Officer Morenz made contact with Officer Tureaud, but he does not remember any details of that conversation.

25.     At the moment in time when Officer Tureaud directed his attention to Lamb's vehicle, Officer Duckworth does not remember if the headlights in Lamb's vehicle were illuminated.

26.     Neither Officer Morenz nor Officer Duckworth were able to remember if they were actually told by any officer(s) that Lamb's vehicle was operated without headlights.

27.     Neither Officer Morenz nor Officer Duckworth witnessed Lamb's vehicle being operated without headlights.

. . . .

29.     The videos show what was stipulated by both parties to be Lamb's vehicle parking with headlights illuminated.

30.     The videos show what was stipulated by both parties to be Lamb's vehicle headlights cease to illuminate only when Lamb's vehicle was not being operated.

11

31.    The videos show some other vehicle, possibly Lamb's vehicle, move through the parking lot with required lights illuminated.

32.    On exhibit 4, Officer Tureaud's body cam, at 13:52, Lamb's vehicle can be seen pulling up in the parking lot with headlights illuminated.

33.    The headlights in Lamb's vehicle were turned off after Lamb's vehicle came to a stop in the position where it was approached from the front by Officers Morenz and Duckworth.

The State expressly challenges findings 29 to 33 "as internally inconsistent and contradicted by undisputed video evidence" "regarding whether headlights were turned on or off during portions of the admitted exhibits."    The State argues that the video recording is "indisputable visual evidence" that Lamb "entered the parking lot of a closed business around midnight, maneuvered her vehicle to observe an ongoing criminal investigation, turned off her headlights while maneuvering her vehicle, left her parked position when noticed by officers, and then returned, again unlit, to a position where she could observe the ongoing investigation." *See State v. Duran*, 396 S.W.3d 563, 570–71 (Tex. Crim. App. 2013) (explaining that appellate courts may review de novo "indisputable visual evidence" contained in videotape but that appellate courts defer to trial court's factual findings on whether witness actually saw what was depicted on videotape); *Miller v. State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012) (explaining that trial court's findings may be disregarded as unsupported by record when they are inconsistent with "indisputable visual evidence").    The State also relies on Officer Morenz's testimony that officers in the unrelated traffic stop had called out a suspicious vehicle in the CVS parking lot and that Lamb's car was suspicious because it was midnight, the vehicle's headlights were not on, and the driver was watching the traffic stop.[5]

---

[5]  At trial, Officer Morenz testified that operating a vehicle without headlights after dark is a criminal offense, but the State acknowledges in its briefing that the applicable provision of

12

Based on its view of the evidence, the State contends that Lamb's "driving behavior," driving without headlights on; the time of the encounter, midnight; and the location of the encounter, the parking lot of a closed business across the street from "an ongoing criminal investigation" establish reasonable suspicion—that the officers had viewed "unusual activity," that Lamb was connected to this activity, and that the "unusual activity was related to crime," the ongoing criminal investigation across the street. But Officers Duckworth and Morenz did not testify that they witnessed Lamb operating her car without its headlights, and neither could remember being told that Lamb's car was being operated without headlights. Further, Officer Morenz testified that it was not a traffic offense to sit in a parked vehicle without the headlights on in a closed business's parking lot and that it was not a crime to watch a traffic stop. Further, based on our review of the admitted video recordings, we cannot conclude that they provide "indisputable visual evidence" that would support disregarding the trial court's challenged findings. Although the trial court incorrectly refers to Officer Tureaud's body-camera recording as Exhibit 4, the trial court identified the specific time on the video where the court found that Lamb's car was driving with headlights on shortly before parking the car and Officers Morenz and Duckworth driving across the street and approaching her. Moreover, Officer Tureaud did not testify about the video recordings from his body and in-car cameras, Officer Morenz was unable to remember the substance of her conversation with Officer Tureaud,

---

the Transportation Code applies to the operation of a vehicle "on a highway unless the provision specifically applied to a different place." *See* Tex. Transp. Code §§ 542.001 (stating that provision of subtitle relating to vehicle's operation "applies only to the operation of a vehicle on a highway unless the provision specifically applies to a different place"), 547.302 (addressing duty to display lights at nighttime). On appeal, the State does not seem to contend that operating a vehicle without headlights in a parking lot is a traffic offense but urges that it would be operating "in an unusual manner."

and Officer Duckworth believed his conversation with Officer Tureaud was about the unrelated traffic stop.[6]

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that the evidence supports the trial court's findings and its implicit conclusion that the officers lacked reasonable suspicion to detain Lamb. *See Ford*, 158 S.W.3d at 492; *see also State v. Calzada-Rodriguez*, No. 03-18-00495-CR, 2019 Tex. App. LEXIS 1614, at *7–8, *11–12 (Tex. App.—Austin Mar. 5, 2019, no pet.) (mem. op., not designated for publication) (affirming trial court's order granting motion to suppress and concluding that record, including video recordings, did not support State's contention that appellee's driving was factor supporting reasonable suspicion to initiate traffic stop).[7] We overrule the State's second issue.

**CONCLUSION**

Having overruled the State's issues, we affirm the trial court's order granting Lamb's motion to suppress evidence.

---

[6] To the extent that the State argues that the parties agreed that "some other vehicle" referenced in the trial court's findings was Lamb's car, we observe that the video recordings from Officer Tureaud were admitted into evidence after Officers Morenz and Duckworth had completed their testimony and without accompanying testimony about what was being seen on the recordings.

[7] We find the precedential case cited by the State to support that the officers had reasonable suspicion to detain Lamb to be factually distinguishable. *See Tanner v. State*, 228 S.W.3d 852, 856, 858–59 (Tex. App.—Austin 2007, no pet.) (upholding finding of lawful detention when officer observed defendant and another individual coming from behind darkened and closed place of business at 3:00 a.m. and defendant did not stop walking when officer flashed patrol car's lights and called out to him).

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Triana, and Kelly

Affirmed

Filed:   March 24, 2022

Do Not Publish